**UNITED STATES of America,**
**Appellant,**

v.

**EL POMAR INVESTMENT COMPANY,**
**Appellee.**

**No. 7342.**

United States Court of Appeals
Tenth Circuit.
April 23, 1964.

---

Phillip Miller, Atty., Dept. of Justice, (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Karl Schmeidler, Attys., Dept. of Justice, Lawrence M. Henry, U. S. Atty., and Merle R. Knous, Asst. U. S. Atty., on the brief), for appellant.

Ben S. Wendelken, Colorado Springs, Colo. (Murray, Baker & Wendelken, Colorado Springs, Colo., of counsel, on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

This is an action to recover on a tax refund claim. It involves the question of whether deficits of predecessor corporations were carried over to successor corporations, which acquired the assets of their respective predecessors through tax-free reorganizations, with the result that earnings and profits of the last successor corporation realized after the last reorganization, but prior to 1951, retained by it until 1951, and in that year distributed to stockholders constituted a return of capital, rather than a dividend, taxable under § 115(a) of the Internal Revenue Code of 1939, 26 U.S.C. § 115(a).

El Pomar Investment Company,[1] a Colorado corporation, is the taxpayer involved. From a judgment in favor of Pomar for $2,621.65, with interest, the United States has appealed.

The case was tried on a written stipulation and the exhibits attached thereto, filed by the parties, from which the following facts appear:

Pomar was a stockholder in the Garden City Company,[2] a Colorado corporation. During the year 1951, it distributed to its stockholders $117,477. Pomar received $67,539 thereof and reported it in its income tax return for 1951 as dividend income and paid the tax thereon. Thereafter, it filed a timely claim for refund of $2,832.13 on the ground that 45.72967 per cent of the amount received by it, or $30,885.36, was a dividend from earnings of Colorado-Garden City and 54.27033 per cent thereof, or $36,653.64, was a return of capital and not taxable. The claim was disallowed and Pomar then brought this action to recover on its claim for refund.

On April 2, 1919, Garden City Sugar and Land Company, a corporation, had outstanding First Mortgage and Refunding Bonds of the face value of $2,224,750; Real, Chattel, and Collateral Trust Bonds of the face value of $2,500,000; and 25-Year Income Bonds of the face value of $685,000. It did not have sufficient cash to pay the interest on the First Mortgage and Refunding Bonds, which had become due January 1, 1919, and had neither funds nor credit through which it could obtain funds to pay the installments of interest on the First Mortgage and Refunding Bonds and the Real, Chattel, and Collateral Trust Bonds, respectively, to accrue and become due July 1, 1919, and it was without funds or credit to finance its farming operations for the current year. A bondholders' committee was created and a plan evolved and reduced to writing for the adjustment of such securities and the establishment of adequate credit with which to provide the necessary working capital for the operations of the current year. Acceptance of the plan was obtained and the bonds were transferred to and deposited with the bondholders' committee.

On October 10, 1919, the bondholders' committee obtained a decree of foreclosure against the Sugar and Land Company in the District Court of Finney County, Kansas. In January, 1920, the committee caused the Garden City Company, a Delaware corporation, and the first successor corporation to be organized.[3] The committee purchased all the property of the Sugar and Land Company at the foreclosure sale had pursuant to such foreclosure decree and transferred all of such property to Delaware-Garden City in exchange for its bonds, having a face value of $4,250,000, and its entire issue of stock, being 100,000 shares of no par value common stock. The new bonds were made inferior to a working capital loan, which was not to exceed $500,000.

During the period January 1, 1914, to January 1, 1920, the Sugar and Land Company had a cash operating deficit of $714,360.46 and an allowed depreciation deficit of $500,024.51, or an aggregate of $1,214,384.97.

At the time Delaware-Garden City was organized, it had neither accumulated earnings nor deficits from operations, except such accumulated earnings or deficits

---

1. Hereinafter called Pomar.

2. Hereinafter called Colorado-Garden City.

3. Hereinafter called Delaware-Garden City.

as were carried over from the Sugar and Land Company.

Delaware-Garden City carried on the same kind of business at the same place and with the same property as had the Sugar and Land Company.

On August 15, 1929, $3,980,417.50 of income bonds of Delaware-Garden City, secured by a mortgage on its property, were issued and outstanding.[4] No interest had been paid on such bonds. On January 1, 1930, all of the principal of such bonds and accrued interest thereon would mature and be payable. Delaware-Garden City was not financially able to pay such principal and interest and a readjustment of the capital financial structure of the company was unavoidable. Aside from the amounts due on such bonds for principal and interest, Delaware-Garden City was in good financial condition and had quick assets of over $500,000, consisting largely of cash and sugar in storage. It was necessary to retain such quick assets in order to finance the current operations of Delaware-Garden City and keep it a going concern, but such assets were sufficient to provide it or a reorganized company with adequate working capital. Aside from the bond indebtedness, Delaware-Garden City had no substantial indebtedness, even for current bills.

Thereafter, pursuant to a plan of reorganization, the following events took place:

On August 15, 1929, a bondholders' committee was created by the holders of income mortgage bonds of Delaware-Garden City; such bondholders transferred such income-mortgage bonds to the 1929 bondholders' committee; the 1929 bondholders' committee obtained a decree of foreclosure of Delaware-Garden City's mortgage securing its income bonds; on November 6, 1930, it organized Colorado-Garden City; and on November 14, 1930, it acquired all of the property of Delaware-Garden City at a foreclosure sale under such decree of foreclosure and caused the same to be transferred to Colorado-Garden City in exchange for all of its authorized common stock, which the bondholders' committee caused to be issued to the bondholders of Delaware-Garden City.

Colorado-Garden City carried on the same kind of business at the same place and with the same property that had been carried on by Delaware-Garden City.

During the period January 1, 1920, to November 17, 1930, Delaware-Garden City had accumulated a total deficit of $2,931,197.02, which included accrued and unpaid interest on income bonds of $2,540,668.28.

At the time Colorado-Garden City acquired all of the assets from the bondholders' committee, it had neither accumulated earnings nor deficits from operations, except such accumulated earnings or deficits as might have been properly carried over from Delaware-Garden City and the Sugar and Land Company.

For the fiscal year ending February 29, 1952, Colorado-Garden City had earnings and profits available for distribution in the amount of $56,843.47, without any deduction for cost depletion; and for the same year had undistributed earnings and profits realized during prior years in the amount of $348,222.54, after payment of dividends in previous years, but before taking into account operating deficits of Delaware-Garden City and the Sugar and Land Company.

On each reorganization all of the debts owing to creditors of the predecessor corporation, other than bond indebtedness, were assumed and paid in full by the successor corporation.

On the first reorganization all of the stock of the successor corporation, Delaware-Garden City, was issued to holders of 25-Year Income Bonds and of Real, Chattel, and Collateral Trust Bonds issued by the predecessor corporation, the Sugar and Land Company, but not *qua* stockholders in the predecessor.

4. Of the original issue of bonds of Delaware-Garden City, $269,582.50 had been retired at the time the 1929 bondholders' committee was formed.

On the second reorganization all of the stock of the successor corporation, Colorado-Garden City, was issued to the several holders of outstanding bonds issued by the predecessor corporation, Delaware-Garden City, each of such bondholders receiving shares of such stock on the basis of his proportionate interest in the whole of such bonds. Thus, on the second reorganization there was a continuity of stock ownership, although certain bondholders of Delaware-Garden City, who may not have been stockholders in it, became stockholders in Colorado-Garden City. While technically the foreclosure on each reorganization wiped out the interests of unsecured creditors and stockholders of the respective predecessor corporation, that result did not actually occur as the reorganization was carried out. On each reorganization the successor corporation assumed and paid in full the indebtedness of the unsecured creditors, although such indebtedness was inferior to the indebtedness secured by the bond mortgage and on the second reorganization all of the holders of stock in the predecessor corporation received stock in the successor corporation, thus preserving a continuity of stock ownership and the adjustment of the bond indebtedness on each reorganization enhanced the value of the stockholders' equity.

The applicable statutory provisions are set forth in Note 5.[5]

5. The Revenue Act of 1918 (c. 18, 40 Stat. 1057), § 202(b), applicable to the 1920 reorganization, provided:

"* * * when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged."

The Revenue Act of 1928 (c. 852, 45 Stat. 791), § 112(b) (4), applicable when the 1930 reorganization took place, provided that:

"No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization."

And § 112(i) (1) of the same Act defined the term "reorganization" as including "a merger or consolidation (including the acquisition by one corporation of * * * substantially all the properties of another corporation) * * *."

Section 22 of the Internal Revenue Code of 1939 defined gross income as follows:

"(a) *General definition.* 'Gross income' includes gains, profits, and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, * * *."

Section 112 of the Revenue Act of 1939, under the heading *"Recognition of gain or loss—"* in part provides:

"(a) *General rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section."

Section 115 [as amended by § 214(b), Revenue Act of 1939, c. 247, 53 Stat. 862] under the heading *"Distribution by corporations"* in part provides:

"(a) *Definition of Dividend.* The term 'dividend' when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

"(b) *Source of distributions.* For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *

* * * * * *

"(d) *Other distributions from capital.* If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued

■ The second reorganization in the instant case was a reorganization in the sense that term was defined in § 112(i) (1) of the Revenue Act of 1928 and the first reorganization in the instant case came within the provisions of § 202(b) of the Revenue Act of 1918.[6]

■ Under § 115(a) (2) a distribution by a corporation to its shareholders out of its earnings or profits of the taxable year in which the distribution is made is a dividend and taxable as such, even though the corporation at the time of such distribution has an accumulated deficit resulting from losses in prior years.[7] But where a corporation realizes earnings or profits in a particular year and retains them until a subsequent year and such corporation, at the time such earnings or profits were realized, had an accumulated deficit resulting from losses during prior years, such earnings or profits, up to the amounts of the existing accumulated deficit, do not become accumulated earnings or profits. Rather, they are a restoration of capital and when distributed to stockholders are a return of capital, not a dividend.[8]

Hence, the specific question for determination is whether the accumulated deficit of the Sugar and Land Company carried over to its successor, Delaware-Garden City, and whether such deficit and the additional deficit accumulated by Delaware-Garden City carried over to Colorado-Garden City.

We believe that the answer to that question may be found in the adjudicated cases dealing with analogous situations and we now turn to a consideration of those cases.

In Commissioner of Internal Revenue v. Sansome, 2 Cir., 60 F.2d 931, c.d. Sansome v. Burnet, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575, a taxpayer bought stock in a New Jersey company on January 1, 1921. On April 1, 1921, the company sold all of its assets to another company, which assumed all of its existing liabilities. The new company issued stock to the shareholders of the old company, proportionately with their respective stockholdings in the old company. The charter of the new company was similar to that of the old company, but provided for expanded business purposes. The old company had a large surplus and undivided profits, earned before January 1, 1921. The new company dissolved in 1923 and began making liquidation payments to its stockholders, which the Commissioner treated as dividends, since the surplus and undivided profits of the old company had not been exhausted by losses

---

before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. * * *"

6. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 183, 62 S.Ct. 540, 86 L.Ed. 775; Palm Springs Holding Corporation v. Commissioner, 315 U.S. 185, 186, 189, 62 S.Ct. 544, 86 L.Ed. 785.

In those cases the court held that the fact that the mechanics of a foreclosure action and sale, or other like mechanics, were employed in effecting the transfer did not prevent it from being a reorganization within the meaning of § 112(i) (1), supra.

See also, Bondholders Committee, Marlborough Investment Co. v. Commissioner, 315 U.S. 189, 191, 192, 62 S.Ct. 537, 86 L.Ed. 784.

In their brief, counsel for the United States frankly admit the reorganizations in the instant case were all tax-free reorganizations.

7. Mertens Law of Federal Income Taxation, 1962 Rev., Vol. 1, § 9.25; Waldheim v. Commissioner of Internal Revenue, 7 Cir., 244 F.2d 1, 5.

8. Van Norman Co. v. Welch, 1 Cir., 141 F.2d 99, 101, 102; Foley Securities Corp. v. Commissioner of Int. Rev., 8 Cir., 106 F.2d 731, 733; see also, Commissioner of Internal Revenue v. W. S. Farish & Co., 5 Cir., 104 F.2d 833, 834, c.d. Blaffer v. Commissioner, 308 U.S. 559, 60 S.Ct. 91, 84 L.Ed. 469; Willcuts v. Milton Dairy Co., 275 U.S. 215, 48 S.Ct. 71, 72 L.Ed. 247; Commissioner v. Phipps, 336 U.S. 410, 413, 69 S.Ct. 616, 93 L.Ed. 771; United States v. Snider, 1 Cir., 224 F.2d 165, 166.

that had been suffered by the new company. Sansome contended that he was entitled to treat the liquidation payments as a return of capital to set off against his cost basis of his stock in determining gain or loss. The Board of Tax Appeals held that the companies were separate entities; that the second corporation had distributed none of its earnings and profits; and that the liquidation payments were a return of capital to be set off against Sansome's cost basis. The Second Circuit reversed and in its opinion in part said:

"However, we prefer to dispose of the case as a matter of statutory construction, quite independently of decisions made in analogous, though not parallel, situations. It seems to us that section 202(c) (2) (42 Stat. 230) should be read as a gloss upon section 201. That section provides for cases of corporate 'reorganization' which shall not result in any 'gain or loss' to the shareholder participating in them, and it defines them with some particularity. He must wait until he has disposed of the new shares, and use his original cost as the 'base' to subtract from what he gets upon the sale. Such a change in the form of the shares is 'an exchange of property,' not 'a sale or other disposition' of them. Section 201 was passed, in some measure at least, to fix what should come into the computation of 'gain or loss'; it allowed all payments except those cut out by subdivision c. It appears to us extremely unlikely that what was not 'recognized' as a sale or disposition for the purpose of fixing gain or loss, should be 'recognized' as changing accumulated profits into capital in a section which so far overlapped the later. * * * Hence we hold that a corporate reorganization which results in no 'gain or loss' under section 202(c) (2) (42 Stat. 230) does not toll the company's life as continued venture under section 201, and that what were 'earnings or profits' of the original, or subsidi-ary, company remain, for purposes of distribution, 'earnings or profits' of the successor, or parent, in liquidation. * * * "

In Commissioner v. Munter, 331 U.S. 210, 67 S.Ct. 1175, 91 L.Ed. 1441, the facts were as follows: In 1928, stockholders of L. Henderson & Sons, Inc., and certain stockholders of Crandall-McKenzie Company agreed together and with underwriters to effect a merger of the two corporations into a new one. The underwriters agreed to buy for cash 52 per cent of the stock of the new corporation for public sale. The new corporation was formed and it acquired all of the assets of Henderson and McKenzie. The six stockholders of Henderson accepted stock in the new corporation as full payment for surrendering their old company stock. Holders of nearly one-half of the stock in McKenzie did not accept new corporation stock, but were paid $355,000 in cash for their old stock. The other McKenzie shareholders accepted for their old stock the new corporation stock. The result was the distribution of the new corporation stock as follows: To old stockholders of Henderson, 9,524 shares; to old stockholders of McKenzie, 14,607 shares; and to the general public, 25,869 shares.

The Commissioner assessed deficiencies against the taxpayers involved, on account of dividends paid them on stock in the new corporation. The new corporation had not realized, after 1928, earnings or profits sufficient to pay such dividends and they were not taxable as such unless the accumulated earnings and profits of the two old corporations carried over to the new corporation.

The court held there was a tax-free merger of the two old corporations into the new corporation and in its opinion said:

"A basic principle of the income tax laws has long been that corporate earnings and profits should be taxed when they are distributed to the stockholders who own the distributing corporation. See Int.Rev.Code §§ 22, 115(a), (b). The controlling

revenue acts in question, however, exempt from taxation distributions of stock and money distributions, at least in part, made pursuant to a reorganization such as transpired here in 1928. See Revenue Act of [May 29] 1928, § 112(b), (c), (i) (1) (A); § 115(c) (h), 45 Stat. 791, 816–818, 822, 823, 26 U.S.C.A.Int.Rev.Acts, pages 377, 378, 379, 385. Thus unless those earnings and profits accumulated by the predecessor corporations and distributed in this reorganization are deemed to have been acquired by the successor corporation and taxable upon distribution by it, they would escape the taxation which Congress intended. * * *"

The court further said that in the Sansome case "it was held that implicit in the tax exemption of reorganization distributions was the understanding that the earnings and profits so exempt were acquired by the new corporation and were taxable * * * when subsequently distributed"; and that Congress had repeatedly expressed its approval of the Sansome rule as a correct interpretation of the purpose of the tax laws governing reorganizations. It further said: "The congressional purpose to tax all stockholders who receive distributions of corporate earnings and profits cannot be frustrated by any reorganization which leaves earnings and profits undistributed in whole or in part" and held that the participation of new investors in the successor corporation did not prevent the operation of the Sansome rule.

In Commissioner v. Phipps, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 717, the facts were as follows: In 1936, the Nevada-California Electric Corporation [9] liquidated five of its wholly-owned subsidiary corporations by transferring to itself all of their assets and assuming all of their liabilities and by redeeming and canceling all of their outstanding stock. It was a tax-free liquidation and no gain or loss was recognized for income tax purposes under § 112(b) (6) of the Revenue Act of 1936. On the date of liquidation one of the subsidiaries had accumulated earnings and profits of $90,362.77, and the other four subsidiaries had deficits which aggregated $3,147,803.62. On December 31, 1936, the parent had earnings and profits accumulated after February 28, 1913, of $2,129,957.81, which amount did not reflect earnings or deficits of the subsidiaries. In 1937, the parent had earnings and profits of $390,387.02.

Phipps was the owner of 2,640 shares of preferred stock of the parent. During 1937, the parent made a pro rata cash distribution to its preferred stockholders of $802,284, of which Phipps received $18,480. The Commissioner determined that the distribution was a dividend under § 115 of the Revenue Act of 1936 and constituted ordinary income in its entirety. Of the 1937 distribution, approximately 49 per cent, or $390,387.02, was attributable to and paid out of earnings and profits of the tax year 1937. When the case reached the Tax Court for review, Phipps conceded the amount paid out of current earnings and profits was taxable as a dividend. The Tax Court held that the balance of the distribution to her was not a taxable dividend distributed out of earnings or profits, on the theory that all of the parent's accumulated earnings and profits, plus the accumulated earnings and profits of the subsidiary that had a surplus were erased and wiped out by the aggregate deficits of the other four subsidiaries. On appeal, the Court of Appeals (Tenth Circuit) affirmed. 167 F.2d 117. The Supreme Court granted certiorari and reversed. In its opinion the Supreme Court said:

"The rationale of the Sansome decision as a 'continued venture' doctrine has been often repeated in the cases, and in some of them the fact that the successor corporation has differed from the predecessor merely in identity or form has lent it plausibility. Other cases, however, demonstrate that the 'continued venture'

9. Hereinafter called the parent.

analysis does not accurately indicate the basis of the decisions. The rule that earnings and profits of a corporation do not lose their character as such by virtue of a tax-free reorganization or liquidation has been applied where more than one corporation has been absorbed or liquidated, where there has been a 'split-off' reorganization, and where the reorganization has resulted in substantial changes in the proprietary interests."

After reviewing Commissioner v. Munter, supra, the court further said:

" * * * We conclude from the cases that the Sansome rule is grounded not on a theory of continuity of the corporate enterprise but on the necessity to prevent escape of earnings and profits from taxation."

In distinguishing the case of Harter v. Helvering, 2 Cir., 79 F.2d 12, the court said:

" * * * In that case the situation was as follows: A Corporation and B Corporation, each of which had accumulated earnings and profits, merged to form C Corporation. By the operation of the Sansome rule, the earnings and profits retained their character as such in the hands of C. Some time later, D Corporation acquired all the stock of C, and thereafter liquidated it in a transaction in which no gain or loss was recognized. At the time of the liquidation of C Corporation, D Corporation, the parent, had a deficit in earnings and profits. The court held, in determining the amount of earnings and profits available to D Corporation after the liquidation for distribution as dividends, that its deficit should be deducted from the accumulated earnings and profits acquired from its subsidiary. It is vigorously contended that the logic of the Harter case compels the allowance of a deduction of the deficits of the subsidiaries from the accumulated earnings and profits of the parent. We believe this view to be the product of inadequate analysis. The difference between the Harter situation and the problem before us may perhaps be clarified by comparing them taxwise if neither liquidation had occurred. Briefly stated, in the case of a distribution to a corporation with a deficit from either current or prior losses, the corporation receiving the distribution has no taxable income or earnings or profits available for current distribution until current income exceeds current losses, and no accumulated earnings or profits until its actual deficit from prior losses is erased. See 1 Mertens, Law of Federal Income Taxation (1942) § 9.30, and cases cited therein n. 44 et seq. In the instant situation, however, the parent did have accumulated earnings and profits available for distribution as dividends, absent the liquidation. * * *

* * * * * *

" * * * Respondent's contention that the logic of the Sansome rule requires subtracting the deficit of the subsidiary from the earnings and profits of the parent as a corollary of carrying over the earnings and profits of the subsidiary has a superficial plausibility; but the plausibility disappears when it is noted that the taxpayer would thus obtain an advantage taxwise that would not be available absent the liquidation since there is no way to 'declare' a deficit, and thus no method of loss realization open to the parent parallel to a declaration of dividends as a mode of realizing the profits of a subsidiary.

* * * * * *

"Congress has expressed its purpose to tax all stockholders who receive distributions of earnings and profits. In order to facilitate simplification of corporate financial structures, it has further provided that certain intercorporate transactions shall be free of immediate tax consequences to the corporations. There has been judicially superim-

posed by the Sansome rule, with the subsequent explicit ratification of Congress, the doctrine that tax-free reorganizations shall not disturb the status of earnings and profits otherwise available for distribution. Nevada-California (the parent) at the time of the 1937 distribution to respondent had such earnings and profits. Since we believe that to allow deduction from these earnings of the deficits of its subsidiaries would be in effect to recognize losses the tax effects of which Congress has explicitly provided should be deferred, the judgment of the Court of Appeals is reversed."

This brings us to a consideration of United States v. Snider, 1 Cir., 224 F.2d 165. In that case there was a tax-free reorganization of a Massachusetts real estate trust, which owned and operated two Boston hotels, the Hotel Braemore and Hotel Kenmore, into two corporations, the Hotel Braemore Corp. and the Hotel Kenmore Corp. The case involved the taxability of a dividend declared by the Hotel Kenmore Corp. In the opinion the court said:

"The plaintiff, Abraham Snider, owned 25 shares of the 100 shares outstanding of the Massachusetts real estate trust which had been organized in 1922. In 1947 the stockholders of the trust agreed that it would be preferable that the hotel properties be owned and operated by two corporations rather than a real estate trust. At this time the trust had a deficit of about $327,000. The Hotel Braemore Corp. was organized on May 29, 1947. The real estate trust transferred the Hotel Braemore property to this Hotel Braemore Corp. in exchange for all the outstanding stock of the latter corporation except for four shares which had previously been issued to the trust for a nominal sum. Also on May 29, 1947, the Hotel Kenmore Corp. was organized and this corporation issued all its outstanding stock to the four stockholders of the

real estate trust in exchange for their trust stock except for four shares which had been issued to these four stockholders for a nominal sum. The Hotel Kenmore Corp. then liquidated the real estate trust and transferred all its assets to itself. Thus the Hotel Kenmore Corp. acquired ownership of the Hotel Kenmore and through its ownership of the stock of the Hotel Braemore Corp., the Hotel Braemore. * * * profits were earned by the Hotel Kenmore Corp. in the fiscal years ending March 31, 1948, 1949, 1950 and 1951 of about $140,000. On December 8, 1950 a cash dividend of $36,000 was paid to the stockholders of the Hotel Kenmore Corp., the plaintiff, Abraham Snider, receiving $9,000. The Hotel Kenmore Corp. had available for distribution in 1950 as current earnings and profits a little over $20,000 and there is no question that approximately $5,100 of the $9,000 received by the plaintiff was clearly dividend income attributable to current earnings and profits and taxable to the plaintiffs.

"The issue in this case is whether any portion of this $36,000 distribution to stockholders of the Hotel Kenmore Corp. may be offset by the 1947 deficit of the Massachusetts real estate trust (which deficit is greater than the earnings and profits accumulated by the Hotel Kenmore Corp. since 1947) despite the fact that the real estate trust was terminated in 1947 following the tax-free reorganization * * *."

The First Circuit, in holding that Snider was distinguishable from and not ruled by Phipps, in its opinion said:

" * * * In the instant case the transferee, Hotel Kenmore Corp., had no accumulated earnings and profits at the time of the reorganization while in the Phipps case the parent corporation did possess accumulated earnings and profits at the date of the tax-free reorganization.

Any distributions made by the parent corporation in the Phipps case would have undoubtedly been dividends and therefore taxable to the recipient if the reorganization had not taken place. The result in the Phipps case was necessary in order to prevent corporations which had earnings and profits from distributing these earnings and profits so as to avoid taxation merely by acquiring the assets of a business possessing a deficit. In the instant case, however, where there were no accumulated earnings and profits at the date of the reorganization of the ownership of the Hotel Braemore and Hotel Kenmore, the taxpayer could not have obtained a tax advantage through a reorganization. In other words, if the taxpayer's business had continued in its trust form and there had been no reorganization, the $3,909.01 distribution clearly would not have qualified as a dividend under the 1939 Internal Revenue Code and therefore would not have been taxable to the plaintiffs.

"There is language in the Phipps opinion which tends to support the plaintiff's contention. At page 420 of 336 U.S., at page 621 of 69 S.Ct., [93 L.Ed. 717] it is said ' * * * the effect of the Sansome rule is simply this; a distribution of assets that would have been taxable as dividends absent the reorganization or liquidation does not lose that character by virtue of a tax-free transaction.' At page 421 of 336 U.S., at page 622 of 69 S.Ct., [93 L.Ed. 717]: 'There has been judicially superimposed by the Sansome rule, with the subsequent explicit ratification of Congress, the doctrine that tax-free reorganizations shall not disturb the status of earnings and profits otherwise available for distribution.'

"Thus, the Supreme Court seems to emphasize the possession by one of the business entities involved in the tax-free reorganization of accumulated earnings and profits at the time of the reorganization. The non-existence of such earnings and profits in the instant case clearly distinguishes it from the Phipps case. * * * " [10]

The First Circuit held that the deficit of the real estate trust could be carried over to offset earnings and profits realized after 1947 by the Hotel Kenmore Corporation, retained by it to a year subsequent to their realization, and then distributed to its stockholders.

But commentators and text writers have placed a broader construction on the opinion in Phipps than did the First Circuit in Snider.

Wales, in his commentary on the subject of "Tax Advantages of an Acquired Corporation," Eighth Annual N.Y.U. Institute on Federal Taxation, pp. 920–924 (1950) said:

"Though as is hereafter pointed out, the main thrust of the decision [the Phipps case] is prevention of tax avoidance * * * the Court apparently lays down a flat rule that deficits of a predecessor cannot be taken over by a successor. Apparently it makes no difference what kind of reorganization occurs—presumably the result would not have been different if the subsidiary had merged into the parent by tax-free statutory merger. And, of course, a taxable reorganization would not carry the deficit in earnings and profits over to a successor. In short, a deficit cannot be acquired by any corporation other than the one where

[10]. See also: Newmarket Manufacturing Company v. United States, 1 Cir., 233 F. 2d 493 and F. C. Donovan, Inc. v. United States, 1 Cir., 261 F.2d 470, 476, where the court was dealing with the carryback of losses provision under § 23(s) and § 122(b) of the Revenue Act of 1939. In those cases the court followed the reasoning it applied in Snider, sustained the claim of the right to carry back the losses and stated that to hold otherwise would defeat the essential purpose of Congress in enacting the provisions for tax-free reorganizations.

it originated; if a corporation dies, its deficit ceases to exist.

\* \* \* \* \* \*

"The result of all this seems to be a flat and somewhat arbitrary rule that deficits do not survive the extinction of the corporation in which they arose. The rule apparently has no exceptions; it is comparable to certain statutory rules designed to prevent avoidance, like, say, Section 24(b) or (c) [of the 1939 Code]."

And in Mertens Law of Federal Income Taxation, 1962, Rev., Vol. 1, § 9.52, p. 102, the author states that under Phipps:

" \* \* \* if the acquiring corporation was the one with the deficit, that deficit would offset the earnings and profits of the transferor or distributor. But if the transferor or distributor had the deficit, that deficit would not wipe out earnings and profits of the acquiring corporation." [11]

■ We think the opinion in Phipps, in keeping with well-settled rules for construing judicial opinions, should be read in the light of the facts on which it is based and the ends it sought to attain.[12]

In Phipps, at the time the subsidiaries were liquidated and merged into the parent, in the year 1936, the latter had earnings and profits accumulated after February 28, 1913, of $2,129,957.81, and four of the subsidiaries had deficits aggregating $3,147,803.62. In 1937, the parent made a distribution to its stockholders of $802,284, of which $390,387.02 was current earnings, and the balance earnings and profits accumulated prior to the merger. It is clear that all of the

1937 distribution would have been taxable as dividends, had there been no liquidation and merger into the parent of the subsidiaries.

Hence, in Phipps, to have permitted the deficits to be carried over to the parent would have resulted in relieving from taxation as dividends distributions which, but for the liquidation and merger, would have been taxable as dividends and would have opened the door to the use of tax-free reorganizations to avoid taxes.

■ We think the reasoning in the Phipps case would also apply to earnings and profits realized by the successor corporation subsequent to the reorganization, retained to a year subsequent to their realization, and then distributed to stockholders, if they would have been taxable as accumulated earnings and profits, had there been no merger or reorganization. That, because the rule in Sansome and Phipps is grounded, we think, on the necessity of preventing earnings and profits from escaping taxation by the utilization of a tax-free reorganization. The utilization of a tax-free reorganization should not be permitted to enable stockholders of the successor corporation to escape taxes on earnings and profits distributed to them if they would have been taxable as such, absent such reorganization.

We think preventing tax avoidance by means of tax-free reorganizations was the touchstone of Sansome and Phipps.

■ In the instant case, however, if instead of carrying out the tax-free reorganization in 1920, the Sugar and Land Company had adjusted its bond debt by issuing new bonds and new stock having preference rights over its outstanding stock, and had it again in 1930, instead

11. See also: Harnack, "Some Tax Considerations Affecting the Design of a Chapter X Reorganization," 37 Marquette Law Review, 130, 141; "The Inheritance of Deficits Under the Sansome Doctrine," 44 Illinois Law Review 379, 381. See, however, Note—"Corporate Reorganization and Continuity of Earning History: Some Tax Aspects," 65 Harvard Law Review 648, 650, 651.

12. Goddard v. United States, 10 Cir., 86 F.2d 884, 885; White v. Aronson, 302 U.S. 16, 21, 57 S.Ct. 794, 81 L.Ed. 1336; Roberson v. United States, 5 Cir., 249 F.2d 737, 743, c.d. 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715; Epstein v. United States, 6 Cir., 174 F.2d 754, 767; Miller v. Kansas City Light & Power Co., 8 Cir., 13 F.2d 723, 729.

of carrying out a tax-free reorganization, again adjusted its bond indebtedness by issuing new stock, and had all of the deficits accumulated by it and by Delaware Garden City up to 1930 been accumulated by it alone, as would have been the case had the reorganizations not occurred, all of such deficits would clearly have been available for an offset against earnings and profits realized by it between the fiscal years 1930 and 1951 and retained by it and not distributed until fiscal 1952, and such distributions not to exceed the amount of such deficits would have been a return of capital and not a taxable dividend. It follows that the reorganizations in the instant case were not carried out in order to avoid taxes on earnings and profits accumulated by the successor corporation at the time of the respective reorganizations or later.

The basis for the rule laid down in Sansome and Phipps being absent in the instant case, we think the rule should not apply.[13] To hold otherwise would tend to defeat the essential purpose of Congress in enacting the provisions for tax-free reorganizations.

It should be noted that the test we have applied is the one used by the Supreme Court in Phipps in distinguishing the Harter case.

United States v. Kavanagh, 8 Cir., 308 F.2d 824, in our opinion, is distinguishable from the instant case. Kavanagh was a reorganization of an insolvent corporation and two of its insolvent subsidiaries under § 77B of the Bankruptcy Act. The reorganizations in the instant case were tax-free and were carried out by bondholders' committees, acting without any judicial supervision or control whatsoever. Here, on each reorganization very valuable properties of the predecessor passed to the successor. In Kavanagh the only assets of any significant value which passed to the reorganized company were the patent rights to a knife sharpening device and the stock of such company was issued only to creditors of the debtor and to new stockholders who paid cash for the stock and the equity of the stockholders of the debtor corporation and its subsidiaries was entirely wiped out. Here, on the second reorganization all of the stockholders of the predecessor corporation became stockholders of the successor corporation, resulting in a continuity of stock ownership.

In Kavanagh, all of the claims, both secured and unsecured, were adjusted. Here, only secured indebtedness of the bondholders was adjusted. Such adjustments increased the stockholders' equity. The indebtedness of all the other creditors, unsecured and inferior in rank to the bond indebtedness, was paid in full.

The second reorganization differed from Kavanagh in another important particular, in that except for its inability to meet the principal and accrued interest due on its outstanding bonds, Delaware-Garden City was in good financial condition, its assets were very substantial,[14] and it had available unencum-

13. Brooks v. Marbury, 11 Wheat 78, 24 U.S. 78, 90, 6 L.Ed. 423; Northern Pac. Ry. Co. v. North American Tel. Co., 8 Cir., 230 F. 347, 355, c.d. 249 U.S. 607, 39 S.Ct. 290, 63 L.Ed. 799; Evans v. Victor, 8 Cir., 204 F. 361, 367; Kling v. Kansas City, 227 Mo.App. 1248, 61 S.W.2d 411, 414; Wermeling v. Wermeling, 224 Ky. 107, 5 S.W.2d 893, 897.

14. It owned a sugar factory capable of slicing approximately 900 tons of beets per day; 25,000 acres of agricultural land located in Kearny and Finney Counties, Kansas; an elaborate irrigation system for the irrigation of its land, which included a storage reservoir capable of impounding 30,000 acre feet of water; an electrical generating plant capable of generating 3,500 kilowatts per hour and approximately 200 miles of standard transmission lines, which not only furnished the factory with electric power, but also supplied power for pump irrigation and provided domestic electricity for the towns of Garden City, Holcomb, Laken and Deerfield, having a population of about 7,000; a standard gauge railroad of approximately 14 miles, equipped with engine and 31 freight cars, running through the property of the corporation and used largely in handling the agricultural products raised on its land and miscellaneous items of personal property.

bered cash and liquid assets sufficient to provide it with an adequate working capital and to pay its debts as they matured and to carry on its extensive business operations. Moreover, even if the deficits of the Sugar and Land Company did not carry over to Delaware-Garden City, which we do not hold, the deficits of the latter, which we do hold carried over to Colorado-Garden City, were more than sufficient to make the distributions here involved a return of capital and require an affirmance of the judgment.

Accordingly, the judgment is affirmed.