John E. McCULLOUGH and Esther D. McCullough

v.

The UNITED STATES.

No. 275-62.

United States Court of Claims.
April 16, 1965.
As Amended April 26, 1965.

Robert T. Molloy, Washington, D. C., for plaintiffs. George E. Bailey, St. Louis, Mo., Grant W. Wiprud, and Dale W. Wickham, Washington, D. C., of counsel.

Philip R. Miller Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Lyle M. Turner, Washington, D. C., was on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

This is an action for the refund of Federal income tax. Plaintiffs were the owners of shares of common stock in the St. Louis-San Francisco Railway Company (hereinafter referred to as "Frisco"). During the years in question, 1957 and 1958, plaintiffs received from the Frisco distributions of $187.50 and $25, respectively. The distributions were treated in plaintiffs' (joint) Federal income tax returns as dividend income. The basis for this action is plaintiffs' assertion now that, in part, the distributions did not represent dividend income, but were, in part, a return of capital.[1] The nature of the distributions depends,

---

1. Section 301 of the Internal Revenue Code of 1954 states, in part, as follows:

"(a) In general.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).
  *    *    *    *    *
"(c) Amount taxable.—In the case of a distribution to which subsection (a) applies—

"(1) Amount constituting dividend.— That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

"(2) Amount applied against basis.— That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

"(3) Amount in excess of basis.—

"(A) In general.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.

"(B) Distributions out of increase in value accrued before March 1, 1913.— That portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax."

Section 316 of the Internal Revenue Code of 1954 states, in part:

"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

"(1) out of its earnings and profits accumulated after February 28, 1913, or

"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. "Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection."

of course, upon the status of the Frisco's "earnings and profits account." [2]

The parties have entered into a stipulation of facts. The stipulation, which includes 10 exhibits, provided the basis for the report of the Trial Commissioner. That report can be summarized as follows:

On November 1, 1932, the United States District Court for the Eastern District of Missouri ordered the appointment of a receiver for the Frisco. The receivership continued until October 1, 1933. On May 16, 1933, the Frisco filed in the district court a petition for the institution of bankruptcy reorganization proceedings. Ultimately, a plan of reorganization was confirmed and consummated, effective as of January 1, 1947.[3]

As of December 31, 1932, the Frisco had outstanding approximately $303,000,000 in debt securities. During the period of the receivership and the reorganization proceedings, interest of approximately $180,900,000 became due and was accrued on the securities. The Frisco, an accrual basis taxpayer, deducted the interest in its Federal income tax returns. Approximately $3,000,000 of the interest was cancelled in 1943, and, on or just prior to January 1, 1947, approximately $76,500,000 was paid in cash to the security holders. Proper treatment of the remaining interest, $101,442,452, is one of the matters in dispute. During the entire period of the reorganization, 1933–46, the Frisco had an aggregate net loss of $50,958,026.90. Deduction of the accrued interest contributed substantially to that loss.

Under the reorganization plan, all outstanding stock, both common and preferred ($114,701,526 in face value), was eliminated and cancelled as worthless. Also cancelled were the unsecured claims which totaled $250,000. The holders of the several classes of secured indebtedness (with total principal amount of $269,119,202) received new bonds, preferred stock, common stock, and cash in full satisfaction of their claims. The total capitalization of the reorganized company was $251,628,494. (See finding 11) On February 28, 1947, the Commissioner of Internal Revenue issued a ruling to the effect that the Frisco plan qualified as a "reorganization" under section 112 (g) (1) of the Internal Revenue Code.[4] (See finding 18)

According to the stipulation of the parties, the distributions which the Frisco made to its shareholders in 1957 and in 1958 exceeded its current earnings and profits for the respective years. Also, it was stipulated that if this court determines that the preexisting deficit in earnings and profits did not survive the completion of the reorgnization, then the Frisco had in 1957 and 1958 sufficient accumulated earnings and profits to cover the distributions in question. Thus, in order to recover, plaintiffs must show that the deficit in earnings and profits carried over to the reoganized corporation, whose stockholders were the previous creditors. A determination that the deficit did survive the reorganization would mean that, to the extent of the deficit, post-reorganization accumulated

2. No actual definition of "earnings and profits" is contained in the Internal Revenue Code or the regulations. But see § 312, Int.Rev.Code of 1954.

Also, see generally, 1 Mertens, Law of Federal Income Taxation § 9.28 (rev.ed. 1962).

3. The reorganization was pursuant to § 77 of the Bankruptcy Act, ch. 774, 49 Stat. 922 (1935), as amended, 11 U.S.C. § 205 (1958).

4. Int.Rev.Code of 1939, § 112(g) (1), as amended, ch. 247, § 213(b), 53 Stat. 870 (1939), as amended.

It should be noted that a special set of provisions dealt with railroad reorganizations. Cf. Int.Rev.Code of 1939, § 112 (b) (9), added by ch. 619, § 142(a), 56 Stat. 838 (1942), as amended, and Int. Rev.Code of 1939, § 112(b) (10), added by ch. 63, § 121, 58 Stat. 41 (1944). Also see Int.Rev.Code of 1939, § 113(a) (20), added by ch. 619, § 142(b), 56 Stat. 839 (1942) and Int.Rev.Code of 1939, § 22(b) (10), added by ch. 619, § 144, 56 Stat. 812 (1942), as amended.

earnings and profits were reduced, and, as a result, part of the distributions to plaintiffs would not be taxable dividend income.[5]

One basic argument put forth by plaintiffs is that the receivership and the reorganization had no effect upon the Frisco's deficit in earnings and profits. Thus, according to plaintiffs, the pre-January 1, 1947, deficit must be included in the computation of accumulated earnings and profits for 1957 and 1958. Plaintiffs stress the fact that the Frisco recapitalization qualified as a "reorganization" under section 112(g) (1) of the Internal Revenue Code.[6] This court does not accept the contentions of plaintiffs.

A case identical to the one at bar, except that different Frisco shareholders were the plaintiffs, has recently been decided. Banister v. United States, 236 F.Supp. 972 (E.D.Mo.1964).[7] Based upon its determination that there was no carryover of the deficit in earnings and profits, the court in Banister granted judgment for the Government. According to the district court, the Frisco emerged from the reorganization (effective January 1, 1947) with a "clean financial slate." Considerable reliance was placed upon the prior decision in United States v. Kavanagh, 308 F.2d 824 (8th Cir. 1962), which also involved the taxability of a distribution received by a shareholder.

In Kavanagh, the distributing corporation, Bell-Sorensen, had been formed in 1940, pursuant to the reorganization under section 77B[8] of three corporations, Equity Finance and Investment Corporation and its two subsidiaries. The assets of the predecessor corporations were transferred to Bell-Sorensen. Fifty-five percent of the stock of the new corporation was distributed to the holders of Equity's bonds in full satisfaction of their claims; the remainder of the stock (45 percent) was issued in exchange for cash. The former unsecured creditors received cash to the extent of one-third of their respective claims. The former shareholders were found to have no equity. The district court held in favor of the plaintiff-shareholder on the ground that the accumulated earnings and profits of Bell-Sorensen were offset by a deficit carried over from Equity. 187 F.Supp. 430 (D.Neb.1960). On appeal, the judgment was reversed. The decision of the court of appeals rested upon alternative grounds: first, there was not sufficient evidence to prove that Equity had had a deficit in earnings and profits; secondly, *there could have been no carryover of any deficit to Bell-Sorensen.* Regarding the effective date of the equitable ownership of the former bondholders, the court of appeals cited Helvering v. Cement Investors, Inc., 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649

---

5. Sections 301, 316, Int.Rev.Code of 1954. See note 1, supra.

6. Int.Rev.Code of 1939, § 112(g) (1), as amended, ch. 247, § 213(b), 53 Stat. 870 (1939), as amended.

   Plaintiffs seek to draw support from Rev.Rul. 54–482, 1954–2 Cum.Bull. 148, which provided in part that a recapitalization under § 112(g) (1) (E) did not diminish the accumulated earnings and profits. However, this court is in agreement with defendant that the principles of Rev.Rul. 54–482 do not govern the questions presented by the Frisco reorganization. The ruling dealt with a situation in which, unlike the Frisco reorganization, the same persons were shareholders (with the same proportion of ownership) before and after the re-

capitalization. Also, the corporation described in the ruling had accumulated earnings and profits, as opposed to a deficit in earnings and profits.

7. According to plaintiffs' counsel in the present case, Banister v. United States, supra, has been appealed to the Court of Appeals for the Eighth Circuit.

   Also, according to plaintiffs' counsel, a third suit involving the precise issue is pending before the Tax Court. Paul and Ella Caspers, T.C. No. 82431.

8. Bankruptcy Act, § 77B, ch. 424, 48 Stat. 912 (1934), as amended. Section 77B was amended by the Chandler Act, ch. 577, 52 Stat. 840 (1938), and is now incorporated in chapter X of the Bankruptcy Act, 11 U.S.C. ch. 10 (1958).

(1942).[9]  In reaching its conclusion that Bell-Sorensen began with a "new financial slate," the court of appeals stated, 308 F.2d at 831, the following:

"When the taxpayer in the case at bar purchased an equity interest in the reorganized company, Bell-Sorensen, the equity interest he received is to be measured by his proportionate share of that corporation's net worth at that time.  He received no equity in the old debtor corporations.  Bell-Sorensen received nothing from the debtor corporations except patent rights and what remained of the $23,700.00 after the Trustee in Bankruptcy paid general creditors of the three debtor corporations 33⅓% of the amount of their claims as allowed and provided in the plan of reorganization approved by the bankruptcy court.  The former bondholders of 'Equity' received stock in Bell-Sorensen 'in full and complete satisfaction and payment of their said claims.'  No 'deficit carryover' could possibly have followed from the old to the new reorganized company from the standpoint of accounting, nor legally, as a consequence of the 77B proceedings."

Despite factual differences between the reorganization involved in the Kavanagh case and the reorganization of the Frisco, this court does accept defendant's assertion that Kavanagh is a relevant decision. The latter case does represent a holding, in the context of a bankruptcy reorganization whereby the interest of the former stockholders was eliminated, that no deficit in earnings and profits was carried over.

Kavanagh v. United States, supra, was held to be controlling in Dunning v. United States, 232 F.Supp. 915, 920 (W.D. Mo.1964).  Like Kavanagh, the Dunning case involved a reorganization under section 77B of the Bankruptcy Act [10] (which did not qualify as a nontaxable "reorganization" [11]).  In Dunning v. United States, the district court (1) pointed out that Kavanagh should not be construed as resting solely upon the finding that no deficit in earnings and profits had been proved, and (2) refused to extend the Sansome [12] rule so as to permit, in a bankruptcy reorganization, the carryover of a deficit.[13]  232 F.Supp. 915, 921.

9. Helvering v. Cement Investors, Inc., is discussed infra.

10. Bankruptcy Act, § 77B, ch. 424, 48 Stat. 912 (1934), as amended. See note 8, supra.

11. Regarding the question of nontaxable "reorganization," § 112(g) (1) of the Revenue Act of 1936, ch. 690, 49 Stat. 1681, was applicable.

12. Commissioner v. Sansome, 60 F.2d 931 (2d Cir.), cert. denied, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 (1932), involved a reorganization whereby corporation A sold all of its assets to a new corporation, B.  Corporation B assumed A's liabilities and the stock of B was distributed to the shareholders of A.  The court of appeals held that the earnings of A carried over to B.

In Commissioner v. Phipps, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771 (1949), the Supreme Court explained that Sansome was not based upon continuity of interest, but on the need to prevent the escape of earnings and profits from taxation.  The Court held, with regard to the tax-free liquidation of five subsidiaries, that the net deficit of earnings and profits of the subsidiaries did not carry over to the parent.  The parent had accumulated earnings and profits.

13. In Dunning v. United States, supra, the court rejected the reasoning of United States v. Snider, 224 F.2d 165 (1st Cir. 1955).  In the latter case, it was held, regarding a tax-free "reorganization," that a deficit in earnings and profits did carry over to the transferee, a newly formed corporation.  In Snider, the First Circuit relied upon the fact that, at the time of the reorganization, none of the business entities involved possessed accumulated earnings and profits.

Without regard to the validity of the reasoning in Snider, this court agrees with defendant in the instant case that Snider is materially distinguishable.  First, the shareholders, of the transferor (a Massachusetts real estate trust) became the owners of the transferee.  Secondly, the reorganization in Snider was not in connection with bankruptcy.

Although this court does not necessarily concur in all the reasoning expressed in Banister v. United States, supra, we are in complete agreement with the result reached in that case. We are of the opinion that, as contended by defendant, the elimination of the former Frisco shareholders, through the recapitalization, had crucial importance with regard to the question of deficit carry-over.[14]

A case upon which plaintiffs place reliance is United States v. El Pomar Investment Co., 330 F.2d 872 (10th Cir. 1964). El Pomar involved two tax-free reorganizations, the first of which occurred in 1920. The bondholders of corporation A purchased A's property at a foreclosure sale and then transferred the property to a new corporation, B. In exchange the bondholders of A received from corporation B bonds and all of B's stock. No shares in B were distributed to the A shareholders as such. At the time, corporation A had an aggregate deficit of approximately 1.2 million dollars.

It developed subsequently that corporation B was unable to pay the principal and interest of its bonds. As a result, the second reorganization took place. The bondholders of B obtained B's property through foreclosure sale. A new corporation, C, was formed and B's property was transferred to C in exchange for C's stock. All of the stock was then distributed to B's bondholders. Corporation B had, at the time of the reorganization, an accumulated deficit of approximately 2.9 million dollars. The court of appeals held that a sufficient deficit did carry over to corporation C, so that certain subsequent distributions to the shareholders of C were the return of capital. 330 F.2d at 884–885.

In support of its decision, the court of appeals stated that the purpose of the rule of Sansome and Phipps[15] was to prevent the avoidance of tax through use of tax-free reorganizations. Then, the court declared the Sansome-Phipps rule to be inapplicable to the reorganizations being considered, since, in the opinion of the court, the respective reorganizations were not carried out in order to avoid tax. Finally, the court found it necessary to distinguish the El Pomar situation from that of United States v. Kavanagh, supra. One ground of distinction was the fact that the reorganizations in El Pomar were tax-free and were accomplished without judicial supervision. Kavanagh, on the other hand, involved a reorganization under section 77B of the Bankruptcy Act. Another stated difference was the fact that in El Pomar, " * * * on the second reorganization all of the stockholders of the predecessor corporation became stockholders of the successor corporation, resulting in a continuity of stockownership."[16] 330 F.2d at 884.

---

14. Defendant contends that neither accumulated earnings and profits nor a deficit in earnings and profits survives a bankruptcy reorganization where the old stock is extinguished. One case which defendant cites in support of this proposition is F. R. Humpage, 17 T.C. 1625 (1952). In Humpage, the Tax Court rejected the Government's assertion that, in a § 77B reorganization, the accumulated earnings and profits of the debtor corporation survived and were transferred to the new corporation. The shareholders of the old corporation received no equity in the new one. The Tax Court reasoned that, under the "full priority doctrine" (cf. Helvering v. Cement Investors, Inc., supra) the bondholders of the old corporation obtained the beneficial ownership of its assets prior to the transfer to the new corporation. Thus, in effect, the earnings of the old corporation were distributed to the bondholders at that time. As a result, there could be no transfer to the new corporation of the accumulated earnings. Four of the Tax Court judges dissented, holding that the Sansome rule was applicable.

15. See note 12, supra.

16. The court of appeals acknowledged that, regarding each reorganization in El Pomar, "technically" the foreclosure wiped out the interests of the stockholders of the respective predecessor corporations. 330 F.2d at 876. Thus, the basis for the court's statement that, with regard to the second reorganization, there was continu-

Defendant in the instant case contends that El Pomar should be limited to a holding that, in the second reorganization there, the deficit of the second corporation (i. e., B) carried over to the third corporation (i. e., C). Defendant points out that, without regard to any deficit carryover from A to B (that is, in the first reorganization), the deficit of B was sufficient to offset the accumulated earnings and profits of the third corporation, C. Defendant accepts the view that the second reorganization in El Pomar did not result in the extinguishment of the interest of the prior stockholders. Thus, by means of this interpretation, defendant attempts to harmonize the result in El Pomar with the position of defendant in the case at bar as to the effect of eliminating the equity of former shareholders.

In the instant case, El Pomar is one of the decisions upon which plaintiffs base their contention that the Frisco deficit in earnings and profits survived the January 1, 1947, reorganization.[17] There are material factual differences between the situation in El Pomar and that of the case at bar. Moreover, this court does not accept plaintiffs' analysis, founded in part upon El Pomar, of the legal tests relevant to the matter of deficit carryover. It is correct, as plaintiffs point out, that the Frisco recapitalization qualified as a "reorganization" under section 112(g) (1) of the Internal Revenue Code of 1939,[18] and that the original corporation continued to exist. However, neither of these factors can in itself be decisive. In the opinion of this court, the greatest difficulty with plaintiffs' analysis is the proposition that, had no reorganization occurred, the deficit would have been used to cancel accumulated earnings and profits. In their brief (p. 24), plaintiffs argue:

" * * * had Frisco's reorganization not taken place, clearly the corporate distributions here in question would not have been made out of accumulated earnings and profits. In consequence, * * * had no reorganization occurred, the tax attribute in question, a deficit in accumulated earnings and profits, would have served the same purpose as is here claimed * * *. In brief, under all the tests laid down by the Supreme Court and this tribunal, Frisco's January 1, 1947, tax-free recapitalization worked no change in its accumulated earnings and profits."

Evidently, plaintiffs ask us to assume that the following events might have occurred: (1) no receivership or bankruptcy reorganization of the Frisco ever took place; (2) as of December 31, 1946, the Frisco had a deficit of 51 million dollars; and (3) somehow, in the following years, the Frisco was able to surmount its financial difficulties and to acquire accumulated earnings and profits against which the deficit would be applied. Perhaps, our statement of the hypothetical situation is not a fair characterization of plaintiffs' assertion, but, in any event, we find little value in speculating as to what might have happened tax-wise if the Frisco had not undergone reorganization. The fact of the matter is that the state of the Frisco's business and its financial condition were such that reorganization under section 77 of the Bankruptcy Act was required and was accomplished. The crucial considerations regarding the question of deficit survival are, in the opinion of this court, the nature of the reorganization and the consequent alteration of the railroad's financial situation.

---

ity of stock ownership was the fact that, for the most part, the bondholders of corporation B (the predecessor in the second reorganization) also owned stock of B.

17. Another of the cases relied upon by plaintiffs is Wisconsin Central R. R. Co. v. United States, 296 F.2d 750, 155 Ct.Cl.

781 (1961), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962). This case dealt with the carryback of a net operating loss.

18. Int.Rev.Code of 1939, § 112(g) (1), as amended, ch. 247, § 213(b), 53 Stat. 870 (1939), as amended.

As indicated previously, the interest of the pre-reorganization stockholders was found to be worthless and was completely eliminated. The former stockholders as such received no part of the ownership of the reorganized corporation. Thus, their investment which had been represented by stock with face value totaling more than $114,000,000 would no longer be reflected upon the books of the Frisco.[19]

Not only did the reorganization affect the position of the former stockholders and the former unsecured creditors, but it also worked fundamental changes in the relation of the Frisco to its secured creditors. In order to achieve the purposes of the reorganization, substantial modification of the secured indebtedness took place. A corporation which, as of December 31, 1946, had obligations for principal in the amount of $269,119,202 and for accrued interest in the amount of $101,442,452 emerged from the reorganization with a total capitalization of $251,628,494. The former secured creditors accepted in full satisfaction of their claims new stock and securities in the amount of $251,628,494. No other debts or liabilities were reflected on the new books of the corporation, as of January 1, 1947. In view of these facts, we consider the position of the plaintiffs that the (receivership and) reorganization had no effect upon the Frisco's earnings and profits account to be untenable. That the reorganization was successful is attested by the fact that, in the following years, the Frisco was able to make and accumulate earnings and profits. Clearly, the reorganization benefited the former secured creditors who thereby became the sole stockholders, as well as those like plaintiffs who would become stockholders in the future. Under these circumstances, we are not willing, in determining the question of deficit carryover, to disregard the effects of the reorganization. We are inclined to agree with the court in Banister, supra, that, under plaintiffs' view, the Frisco would be in a position of "having its cake and eating it too."

Furthermore, as indicated in our discussion of Banister v. United States, supra, this court accepts defendant's assertion that the recapitalization of the Frisco eliminated the deficit in earnings and profits. One argument put forth by defendant is that, when the former stockholders were eliminated, the deficit in earnings and profits was in effect distributed or dissipated. Of course, there can be no "distribution" of a deficit in the same sense that positive earnings and profits can be distributed to stockholders. On the other hand, considering the relationship between the investment of the old shareholders and the deficit, we believe that the notion suggested by defendant is helpful in explaining the conclusion that there could be no carryover of the deficit in earnings and profits. As defendant indicates, this concept is similar to the reasoning of United States v. Kavanagh, supra, where the court held that a deficit did not survive a bankruptcy reorganization. Also, in all likelihood, as defendant asserts, the fact that the old stock became worthless led to a deduction for the former shareholders and such deductions can be attributed to the earnings and profits deficit.

Thus, this court holds that, upon completion of the Frisco reorganization, the preexisting deficit was wiped out. In making this determination, we do not attempt to state a general rule regarding the effect of "reorganizations" or recapitalizations upon deficits in earnings. Rather, our holding is limited to the circumstances of the Frisco reorganization.[20] As the court in United States v. Kavanagh, supra, found with respect to the reorganization there in question, we hold that no deficit of the Frisco carried over either "legally" or "from the stand-

---

19. Cf. Testa, "Earnings and Profits" After Bankruptcy Reorganization, 18 Tax L. Rev. 573 (1963).

20. It should be noted that presently § 381 of the Int.Rev.Code of 1954 deals with the subject of carryovers in corporate acquisitions.

point of accounting." [21] This result is, in our opinion, consistent with the principles enunciated in Commissioner v. Sansome, supra note 12, and Commissioner v. Phipps, supra note 12.

Our decision that the deficit in earnings and profits did not survive the reorganization is fatal to plaintiffs' position regarding this issue. (See finding 17(i).) Still, some mention should be given to the argument of plaintiffs that, if the receivership and reorganization proceedings had any effect upon earnings and profits, the effect was to reduce earnings and profits to zero as of November 1, 1932 (as opposed to January 1, 1947). Under this view, the deficit in earnings and profits which arose during the insolvency proceedings would carry over to the reorganized Frisco. The basis for plaintiffs' argument is the "full priority rule" which was expressed in Helvering v. Cement Investors, Inc., 316 U.S. 527, 532, 62 S.Ct. 1125, 1127, 86 L.Ed. 1649 (1942), as follows:

> "In case of reorganizations of insolvent corporations the creditors have the right to exclude the stockholders entirely from the reorganization plan. When the stockholders are excluded and the creditors of the old company become the stockholders of the new, 'it conforms to realities to date their equity ownership' from the time when the processes of the law were invoked 'to enforce their rights of full priority.' Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179 [62 S.Ct. 540, 543, 86 L.Ed. 775]." * * *

In Helvering v. Cement Investors, Inc., the Supreme Court held that a certain reorganization under section 77B of the Bankruptcy Act, although not a "reorganization" under section 112(g) (1) (B) or section 112(g) (1) (C) of the Revenue Act of 1936, did constitute an "exchange" under section 112(b) (5) of the Revenue Act of 1936.[22] The Court found that the creditors of the old company had an equitable interest in the property which was transferred to the new corporation.

In Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942) (cited in Helvering v. Cement Investors, Inc., supra), and in subsequent cases, the "full priority doctrine" has been used to enable an insolvency reorganization to satisfy the test of "continuity of interest," a requirement for a tax-free "reorganization." That is, for purposes of "continuity," the Court permitted the ownership of the shareholders of the new corporation to relate back to the time when they, as the creditors of the old corporation, exercised their right of priority over the shareholders of the old corporation.[23]

This court does not accept the contention of plaintiffs that November 1, 1932, the date upon which the Frisco receivership was commenced, was the decisive date with regard to the alteration of the earnings and profits account. There is, in our opinion, no warrant for extending the "full priority rule" to the lengths which plaintiffs request. The recapitalization became effective on January 1, 1947, and that date must be considered as the time when the Frisco's earnings and profits became zero (i. e., when the aggregate deficit of the years, 1933 through 1947, was eliminated).

As defendant points out, the bondholders of the Frisco did not actually become stockholders on November 1, 1932. In

---

21. Defendant points out that, as of January 1, 1947, the Frisco opened a new set of books which reflected only the new stock and securities. No entry was made regarding earned surplus or deficit. Although corporate accounting practice is not decisive of the tax questions, it is one factor to be considered.

22. Revenue Act of 1936, ch. 690, § 112, 49 Stat. 1678.

23. It should be noted that the concept that the equitable ownership of creditors dates from the invoking of their creditors' rights has been used, in a different context, in such cases as United States v. Kavanagh, supra, and F. R. Humpage, supra note 14.

fact, it was largely because of the existence of the bonded indebtedness that the deficit in earnings and profits arose. That is, the deficit can be attributed to the deduction of interest which accrued on the bonds in the years subsequent to 1932. (See finding 14) The view of plaintiffs would have us disregard the actual financial situation and this we decline to do.

Since this court has already determined the issue of deficit carryover adversely to plaintiffs, we find it unnecessary to discuss the remaining questions.

In conclusion, we hold that the distribution which plaintiffs received from the Frisco in 1957 and 1958 were fully taxable as ordinary income. Absent a determination that the preexisting deficit in earnings and profits survived the completion of the reorganization, the Frisco had as of 1957 and 1958 sufficient accumulated earnings and profits so that the entire distributions would constitute dividends. This court has indicated its decision that the deficit did not survive. Accordingly, the tax benefit which plaintiffs seek to obtain must be denied. The amounts which plaintiffs received from the Frisco in 1957 and 1958 did not represent the return of capital, but, on the contrary, constituted a distribution of current *and* accumulated earnings and profits and were, therefore, taxable in their entirety as dividends.

However, under the stipulation of the parties (finding 22(ii), infra) this determination means that plaintiffs incurred a long-term capital loss in 1957, as a result of the sale of their Frisco stock. The amount of recovery to which plaintiffs are entitled on account of this loss is to be determined pursuant to Rule 47(c) (2).