Richard H. DUNNING and Beulah Marie Dunning, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17952.

United States Court of Appeals Eighth Circuit.

Dec. 22, 1965.

Richard H. Brown, of Hillix, Hall, Childers, Brown & Hoffhaus, Kansas City, Mo., made argument for appellants and filed brief with Albert F. Hillix, of Hillix, Hall, Childers, Brown & Hoffhaus, Kansas City, Mo.

Fred R. Becker, Atty., Tax Div., Dept. of Justice, Washington, D. C., made argument for appellee and filed brief with John B. Jones, Jr., Acting Asst. Atty. Gen., and Meyer Rothwacks, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., and F. Russell Millin, U. S. Atty., Kansas City, Mo.

Before VAN OOSTERHOUT and MEHAFFY, Circuit Judges, and MEREDITH, District Judge.

VAN OOSTERHOUT, Circuit Judge.

This is a timely appeal by taxpayers, Richard H. Dunning and Beulah Marie Dunning, from final judgment of the District Court dismissing their suit to recover alleged overpayments of income tax for the years 1958, 1959 and 1960, in the respective amounts of $27.83, $26.15 and $29.78. Taxpayers owned stock during each of such years in the Missouri Public Service Company and received cash distributions in the amount of $511.20, $548.46 and $827.28 respectively. Such stock distributions were reported in taxpayers' federal income tax returns as dividend income and tax was paid thereon. Thereafter, taxpayers filed timely claims for refund based upon the ground that the predecessor of the present Missouri Public Service Company had a deficit in accumulated earnings which passed to the present corporation, and that such deficit offset the accumulated earnings of the present corporation and thus the portion of the distribution for each year which exceeded current earnings and profits was a return of capital and not taxable as dividend income. Taxpayers concede that the portion of the distributions paid out of current earnings is taxable as dividend income under § 301 I.R.C.1954.

Jurisdiction exists in the trial court under 28 U.S.C.A. § 1346(a) (1).

Judge Oliver, in his memorandum opinion reported at 232 F.Supp. 915, fairly summarizes the facts, all of which are stipulated, sets out in detail the issues and contentions of the parties, cites and discusses relevant cases and upon the basis thereof denies taxpayers the relief which they sought.

The controlling issue presented by this appeal is whether the District Court correctly decided under the facts and circumstances disclosed by the record that the present corporation, Missouri Public Service Company, is not entitled to offset against its own accumulated earnings and profits the pre-1936 earnings and profits deficit of its predecessor corporation which had been discharged in a 77B bankruptcy proceeding. The present corporation has had sufficient accumulated earnings subsequent to the 77B reorganization to cover the entire distributions made in 1958, 1959 and 1960.

The parties have stipulated that "if no part of the deficit of the debtor Missouri Public Service Company as of November 30, 1936, is carried over beyond that date and the earnings and profits as of December 1, 1936, are to be considered zero, then all the distributions through the years, including the three years involved in this action, constitute taxable dividends." 232 F.Supp. 915, 919.

Taxpayers contend that the reorganization arising out of the bankruptcy proceedings is a non-taxable reorganization under § 112(g) (1) (E) and (F) I.R.C.1939 (formerly Revenue Act of 1936 § 116(g) (1) D and E), or if it was not a tax-free reorganization, the exchange which occurred was a non-taxable

exchange under § 112(b) (5) I.R.C.1939. While the Government vigorously disagrees with the foregoing contentions, it states in its brief that even if it be assumed that the 1936 exchange was non-taxable under any of the theories advanced by taxpayers, the taxpayers cannot prevail because the pre-reorganization deficit of the bankrupt corporation was under the facts of this case completely extinguished by the bankruptcy proceedings, leaving no accumulated deficit to carry over.

Section 316 I.R.C.1954 provides:

"SEC. 316.  DIVIDEND DEFINED.

(a) *General Rule.*—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * * "

■ As heretofore stated, taxpayers concede that the distributions made are taxable as dividends to the extent of current earnings.  In order to escape dividend treatment as to the balance of the distributions, the burden is upon the taxpayers to show that the corporation had no accumulated earnings or profits from which the distribution could be made. United States v. Kavanagh, 8 Cir., 308 F.2d 824, 832; McCullough v. United States, Ct.Cl., 344 F.2d 383, 385.  Taxpayers have failed to meet such burden.

It is conceded that the present corporation had accumulated sufficient earnings and profits subsequent to the 1936

reorganization to fully cover the distributions made unless it is entitled to claim the pre-reorganization loss of its predecessor.  Such predecessor, bearing the same name and herein referred to as the bankrupt, was incorporated in Missouri in 1926.  In 1935 such corporation, being unable to meet its financial obligations as they matured, filed for reorganization under 77B (now Chapter 10) of the Bankruptcy Act in the Northern District of Illinois.  A plan of reorganization was thereafter submitted and approved by the interested parties and by the court.  The effective date of such reorganization was November 30, 1936.  Pursuant to such reorganization plan, all of the assets of the bankrupt were turned over to the newly organized company, the Missouri Public Service Company of Delaware.  Such company had entered an appearance in the reorganization proceedings and had agreed to the terms of the reorganization plan.  Under the terms of the reorganization plan, which are more fully set out in the trial court's opinion, the pre-existing 59,970 shares of common stock of the debtor, which carried a book value of $2,999,500, were in effect completely wiped out.  Immediately prior to the reorganization all of such common stock was beneficially owned by Middle West Utilities Company.  It received no stock or other consideration for its common stock in the bankrupt corporation except it was issued warrants expiring December 31, 1939, authorizing it to purchase 13,000 shares of stock in the new corporation at $25 per share.  Such rights were never exercised.  The record discloses that the highest market price attained by the new stock was $6.25 a share and that no offer could be obtained for the warrants.

The holders of the preferred stock, which had a book value of nearly $100 a share, received one and one-half shares of new common stock for each share of preferred stock.  Holders of $6,351,000 of the bankrupt's bonds due in 1947 received $4,445,700 in new bonds due in 1960, or 70% of the original bond in-

debtedness. They also received $52.50 interest on each $1,000 bond and one share of common stock for each $100 in bonds. The holders of notes and accounts payable were paid in common stock. One hundred thirty three thousand, seven hundred and five shares of new stock were issued, of which the preferred shareholders received 22.39%, the bondholders 47.5% and the creditors 30.11%. Middle West was the principal creditor of the bankrupt, holding notes and accounts payable aggregating $1,348,314, for which it received 40,136 shares of stock in the new corporation.

The balance sheet of the bankrupt immediately prior to reorganization shows total book value of assets of $14,164,551 and liabilities in the same amount. The December 1, 1936, post-reorganization statement shows reduction of assets and liabilities to $9,426,610.35. Extensive appraisals were made of the bankrupt's assets by appraisers and by the Missouri Public Service Commission and the reductions were brought about in order to reduce the book valuation of the assets to something approaching its actual value.

It is stipulated that the pre-reorganization deficit in earnings and profits of the bankrupt is $1,465,628. Taxpayers in brief claim this figure should be some $400,000 higher by reason of other items properly chargeable to earnings and profits. It would appear that the accumulated deficit was at least an important factor in bringing about the debtor's filing of the 77B petition. Liabilities of the debtor in excess of the accumulated deficit in earnings were wiped out in the bankruptcy proceedings.

The trial court quotes from our opinion in Kavanagh as follows:

"'No "deficit carryover" could possibly have followed from the old to the new reorganized company from the standpoint of accounting, nor legally, as a consequence of the 77B proceedings.

"'The only inference to be made from the stipulated facts and documentary evidence in the case at bar is that Bell-Sorensen started out with a new financial slate.' (l. c. 831 of 308 F.2d)."

and then goes on to say:

"It would seem to be clear that the Court of Appeals' opinion in Kavanagh accepts fully the implication of Phipps that neither 'logic' nor Sansome requires that an earnings and profits deficit be carried over in the same manner as an earnings and profit surplus."

\* \* \* \* \* \*

"The factual realities require recognition of the fact that the entire 77B proceeding was designed, as Kavanagh quite tersely suggests, to start a new corporation out 'with a new financial slate.' The earned surplus account on the balance sheet of the new corporation, as of December 1, 1936, per the company books was recorded as zero. So far as book entries were concerned in 1936, it is clear that no one thought in 1936 that any deficit carry-over was supposed to have 'followed from the old [debtor corporation] to the new reorganized company from the standpoint of accounting nor legally, as a consequence of the 77B proceeding,' to again borrow the language of Kavanagh (l. c. 831 of 308 F.2d). \* \* \*" 232 F.Supp. 915, 923, 925.

Taxpayers urge that in this case, as well as in Kavanagh, it was error to place any significance upon the fact that no balance sheet or any other financial statement appeared in the record which revealed any carry-over of the pre-existing earnings deficit. We did not hold in Kavanagh nor do we hold here that such factor standing alone is controlling under all circumstances. For some purposes, it may be entirely true that general financial statements do not always reflect all information pertinent to tax liability. However, the entries on the corporate records are entitled to consideration. See McCullough v. United States, supra, (p. 391 of 344 F.2d and footnote 21). Taxpayers urge that Kavanagh is factually distinguishable from the instant

case and that by reason of such distinctions, it is not controlling here. There are of course factual distinctions but we believe that the principles announced and followed in Kavanagh, hereinabove set out, apply here.

Taxpayers place considerable reliance on the doctrine of Commissioner of Internal Revenue v. Sansome, 2 Cir., 60 F.2d 931, and United States v. Snider, 1 Cir., 224 F.2d 165, and United States v. El Pomar Investment Co., 10 Cir., 330 F.2d 872. Sansome and Snider were fully considered by us in Kavanagh, and all of the cases relied upon are carefully analyzed and considered by the trial court in its well-written opinion. As pointed out by the trial court, Commissioner of Internal Revenue v. Phipps, 336 U.S. 410, 417, 69 S.Ct. 616, 93 L.Ed. 771, holds that the Sansome rule is designed to effectuate the Congressional purposes to tax all stockholders who receive distributions of corporate earnings and that such purpose cannot be frustrated by any reorganization which leaves earnings or profits undistributed in whole or in part. The Supreme Court in Phipps states, "We conclude from the cases that the Sansome rule is grounded not on a theory of continuity of the corporate enterprise but on the necessity to prevent escape of earnings and profits from taxation." 336 U.S. 410, 417, 69 S.Ct. 616, 620.

We adhere to our view expressed in Kavanagh that the Sansome rule does not apply to loss of earnings carry-over such as the one involved in the instant case. El Pomar relied upon by taxpayers contains an excellent discussion of the reasons why the Sansome rule should not apply to loss carry-overs. The Court of Appeals in El Pomar, pp. 882–883 of 330 F.2d, sets forth criticisms which followed such an application in the Snider case, then reverses its district court and properly holds that preventing tax avoidance by means of a tax-free reorganization is the touchstone of Sansome and Phipps and determines that the reorganizations it was considering were not carried out to avoid taxes, and hence, "The basis for the rule laid down in Sansome and Phipps

being absent in the instant case, we think the rule should not apply." 330 F.2d 872, 884.

The El Pomar court distinguishes our Kavanagh case, pointing out that the reorganization before it was carried out voluntarily, whereas the Kavanagh reorganization took place in a 77B proceeding. It also emphasizes that in Kavanagh all claims, both secured and unsecured, were adjusted while in the second reorganization in El Pomar "only secured indebtedness of the bondholders was adjusted. Such adjustments increased the stockholders' equity. The indebtedness of all the other creditors * * * was paid in full." 330 F.2d 872, 884. Thus, the issue of whether any deficit in earnings will remain as a result of a reorganization ordinarily presents a fact issue to be determined upon the facts of the particular case.

In addition to Kavanagh, the Government relies upon three recent decisions to support its position: McCullough v. United States, Ct.Cl., 344 F.2d 383, cert. denied, 382 U.S. 901, 86 S.Ct. 232, Nov. 8, 1965; Banister v. United States, E.D. Mo., 236 F.Supp. 972, appeal to Eighth Circuit dismissed May 12, 1965; Caspers v. Commissioner, 44 T.C. 411; cf. Willingham v. United States, 5 Cir., 289 F.2d 283. McCullough, Caspers and Banister all deal with the same 77B reorganization, that of the Frisco Railway Co. in 1947. Frisco had been placed under trusteeship for the benefit of creditors in 1933 under the provisions of § 77B. The trusteeship continued for fourteen years showing "aggregate losses during the entire period of the reorganization * * of $50,958,028.90." 236 F.Supp. 972, 973. When the plan of reorganization was finally approved and the successor corporation began operations on its own, the pre-reorganization deficit was claimed against cash distributions to the stockholders of the new company. The courts in all three cases refused to allow the offset. The first decision, Banister, was followed in McCullough and Caspers. In its findings to the effect that the disposition of Frisco's liabilities in bankruptcy was

to deny any later offsets against cash distributions by the successor corporation, the Banister court found that:

"To allow plaintiffs' contentions to prevail in this case would be to give Frisco a position of 'having its cake and eating it too.' It would be allowing Frisco to proceed through bankruptcy and reorganization and thereby obtain a complete discharge of its liabilities but yet being able to continue its operations. Then, despite the discharge of the old debts in the reorganization, plaintiffs would have Frisco now use the pre-reorganization deficit created by those liabilities to offset its earnings and profits of subsequent business years. It is a double benefit that is sought: Escape of liability for its debts, but also escape from taxation of its shareholders by taking advantage of its former operating deficit. It was not the purpose of either the bankruptcy or the tax laws to permit such a doubled advantage. As of the 1947 reorganization of Frisco it received a clean slate; it was able to continue operations as a going concern, free of its former economic burdens. But, along with this fresh start went the duties and burdens shared by all businesses, one of these being taxation of its own income and the dividend income of its shareholders, and the distribution of dividends by a corporation to its shareholders does not lose its true nature by the distributing corporation merely calling it one out of capital. There was no existing deficit which Frisco could take advantage of and thereby make its distribution one out of capital. Therefore, the only result is that it was a dividend paid out of earnings and profits to shareholders and fully taxable to them as dividend income." 236 F.Supp. 972, 974–975.

The Banister language quoted above was based in large measure on the court's reading and interpretation of our Kavanagh opinion.

While as heretofore stated we do not believe the question of whether or not the reorganization is tax free is material to our decision, we note that in McCullough the Commissioner conceded and the court found that the reorganization was tax free. Nevertheless, the court held the deficit would not carry over to the reorganized corporation. The court states:

"[W]e find little value in speculating as to what might have happened tax-wise if the Frisco had not undergone reorganization. The fact of the matter is that the state of the Frisco's business and its financial condition were such that reorganization under section 77 of the Bankruptcy Act was required and was accomplished. The crucial considerations regarding the question of deficit survival are, in the opinion of this court, the nature of the reorganization and the consequent alteration of the railroad's financial situation." 344 F.2d 383, 389.

The McCullough court places considerable significance upon the fact that the interests of pre-existing stockholders were wiped out, and that the reorganization worked substantial change in Frisco's position with its former creditors, secured and unsecured, and that it had liabilities of $269,119,202 and owed accrued interest in the amount of $101,442,552 but emerged from the reorganization with a capitalization of $251,628,494. The court observes,

"In view of these facts, we consider the position of the plaintiffs that the (receivership and) reorganization had no effect upon the Frisco's earnings and profits account to be untenable. * * * Under these circumstances, we are not willing, in determining the question of deficit carry-over, to disregard the effects of the reorganization. We are inclined to agree with the court in Banister, supra, that, under plaintiffs' view, the Frisco would be in a position of 'having its cake and eating it too.'

"Furthermore, as indicated in our discussion of Banister v. United States, supra, this court accepts defendant's assertion that the recapitalization of the Frisco eliminated the deficit in earnings and profits." 344 F.2d 383, 390.

The court qualifies its holding by stating, "In making this determination, we do not attempt to state a general rule regarding the effect of 'reorganizations' or recapitalizations upon deficits in earnings. Rather, our holding is limited to the circumstances of the Frisco reorganization." 344 F.2d 383, 390.

In our present case, the wiping out of the old capital stock, the downward adjustment of the preferred stock, the substantial adjustment of both secured and unsecured indebtedness, and the decrease in capitalization are comparable with the factors which the McCullough court found to be significant in determining that no deficit in earnings remained after the reorganization.

█ The taxpayers have failed to meet the burden imposed upon them to show that any loss of earnings account remained after the reorganization which could be carried over. Upon this record, the trial court was fully warranted in determining that the deficit in earnings account of the bankrupt corporation was completely wiped out by the bankruptcy proceedings and that consequently no deficit in earnings account remained for transfer to the successor.

It is stipulated that if the present corporation is not entitled to the benefit of the deficit in earnings of its predecessor that its accumulated earnings are sufficient to cover all the disbursements made in the taxable years involved. The court rightly determined under the facts and circumstances of this case that the disbursements were made out of earnings and hence were taxable.

We recognize that corporate reorganizations, whether they result from voluntary arrangements or under Chapter 10 of bankruptcy proceedings, are not all alike, and that such reorganizations may vary greatly with respect to the amount of economic distress involved and as to reorganization plans that may be adopted. Hence, like the Court of Claims in McCullough, we decide this case upon the facts before us and we are not laying down any absolute rule regarding the effect of bankruptcy reorganizations upon earnings deficits under all conceivable situations.

Determination that no earnings deficit remained after the bankruptcy reorganization which could be carried over to the successor corporation is dispositive of this appeal. Therefore, we do not reach or discuss other issues raised by the parties.

The judgment appealed from is affirmed.