DAYTONA BEACH KENNEL CLUB, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7798–75.     Filed March 30, 1978.

*Richard Katcher*, for the petitioner.
*Curtis O. Liles III*, for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in petitioner's income taxes:

| FYE Apr. 30— | Deficiency |
|---|---|
| 1970 | $366,916.08 |
| 1971 | 404,970.30 |
| 1972 | 15,684.32 |
| | 787,570.70 |

The deficiencies in major part resulted from disallowance of net operating loss deductions during the taxable years at issue of $715,337.72, $850,238.23, and $32,675.65, respectively.[1]

The notice of deficiency set forth as grounds for the disallowance:

(1) your acquisition of Magnolia Park, Inc. on April 30, 1969 pursuant to a confirmed plan for reorganization under Chapter X of the Bankruptcy Act does not entitle you to deduct the net operating losses reported by Magnolia Park, Inc. prior to April 30, 1969, because your acquisition of Magnolia Park, Inc. is not an acquisition described in section 381 of the Internal Revenue Code of 1954, and; (2) Magnolia Park, Inc. has not continued to carry on a trade or business substantially the same as that conducted prior to your acquisition of all of the said corporation's outstanding stock on or about March 24, 1966, as required by section 382 of the Internal Revenue Code. * * *

Respondent has since conceded in stipulation of facts paragraph 60 that the acquisition by petitioner of Magnolia Park, Inc., pursuant to the agreement of merger, effective April 30, 1969, was an acquisition of assets described in section 381(a), I.R.C. 1954,[2] and that any net operating loss carryover of Magnolia Park, Inc., to which petitioner is entitled to succeed and take into account under section 172 shall not be reduced by provisions of section 382(b). In his opening statement counsel for respondent indicated that respondent would rely on section 269 and the rationale of *Willingham v. United States*, 289 F.2d 283

---

[1]Petitioner does not contest that portion of the deficiency asserted for fiscal year 1970 to the extent it results from disallowance of an interest expense deduction of $3,663.12.

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.

(5th Cir. 1961), to support his denial of the carryover of Magnolia Park, Inc.'s operating losses to petitioner.

In his brief respondent further concedes that petitioner is entitled to a deduction under section 172 in respect of the net operating losses of Magnolia Park, Inc., incurred subsequent to the reorganization of Magnolia Park, Inc., under the provisions of chapter X of the Bankruptcy Act and prior to the 1969 statutory merger of Magnolia Park, Inc., into petitioner. Respondent also argued at trial that section 382(a) applied to disallow the carryforward of Magnolia Park, Inc.'s net operating losses incurred prior to its reorganization under chapter X. Because of his failure to continue the argument on brief, we assume that it has been abandoned.

Because of these concessions, two primary issues remain to be resolved:

(1) Whether the carryover by petitioner of those net operating losses incurred by Magnolia Park, Inc., prior to its reorganization under chapter X of the Bankruptcy Act is prohibited by section 269(a); and, even if not,

(2) Whether the rationale of *Willingham v. United States*, 289 F.2d 283 (5th Cir. 1961), applies to extinguish for purposes of section 172 the net operating losses incurred by Magnolia Park, Inc., prior to its reorganization under chapter X.

Respondent also concedes in his brief that his reliance at trial upon section 269(a) and the rationale of *Willingham v. United States, supra*, in support of the determination that the .net operating losses incurred by Magnolia Park, Inc., prior to its reorganization under chapter X of the Bankruptcy Act could not be carried over to petitioner constitutes a new matter upon which respondent bears the burden of proof, pursuant to Rule 142(a), Tax Court Rules of Practice and Procedure.

These concessions necessitate our decision being entered under Rule 155, Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Daytona Beach Kennel Club, Inc. (hereinafter referred to as Daytona Beach), is a corporation which had its principal place of business on August 22, 1975, in Daytona Beach, Fla. For the fiscal years ending April 30, 1970, April 30, 1971, and April 30, 1972, Daytona Beach filed Federal corporate income tax returns

with the Southeast Service Center of the Internal Revenue Service in Chamblee, Ga. Its principal business activity within the State of Florida from the date of incorporation in 1958 to the present time has been the ownership and operation of a greyhound racetrack in the vicinity of Daytona Beach, Fla.

Magnolia Park, Inc. (hereinafter referred to as Magnolia Park), was organized under the laws of the State of Louisiana on or about July 16, 1953.

Magnolia Park owned approximately 152 acres of land in Metarie, Jefferson Parish, La. On this real property (hereinafter referred to as the Metarie property), Magnolia Park operated the Jefferson Downs Thoroughbred Horseracing Track (hereinafter referred to as Jefferson Downs Racetrack).

On March 8, 1955, Magnolia Park sold the 152-acre Metarie property to Malcom Woldenberg and Steven Goldring (hereinafter referred to as Woldenberg and Goldring). Ownership of the improvements on the Metarie property was retained by Magnolia Park. Woldenberg and Goldring then leased the Metarie property to Magnolia Park. Woldenberg and Goldring were unrelated to the owners of Magnolia Park.

Subsequent to the sale-leaseback of the Metarie property, Magnolia Park suffered financial reversals. In early 1958 a petition for reorganization of Magnolia Park under chapter X of the Bankruptcy Act was filed in respect to Magnolia Park in the United States District Court for the Eastern District of Louisiana. Richard B. Montgomery, Jr. (hereafter referred to as trustee), was appointed trustee of Magnolia Park.

On November 1, 1958, Woldenberg and Goldring executed a "Net Ground Lease" leasing to Montgomery in his capacity as trustee of Magnolia Park the Metarie property for a term of 30 years and 2 months.

Jefferson Downs, Inc., a Louisiana corporation organized on November 3, 1958, acquired from the trustee pursuant to an "Operating Agreement and Lease" executed in early November 1958 a sublease of the Metarie property and the right to operate the Jefferson Downs Racetrack for a term of 2 years with an option to renew the lease for an additional 28 years. Jefferson Downs, Inc., exercised the option. The racing permit required by the State of Louisiana was acquired in the name of Jefferson Downs, Inc. Shortly after Jefferson Downs, Inc., was incorporated, more than 90 percent of its stock was purchased by a group

of investors headed by John Masoni (hereinafter referred to as Masoni). This group, comprised of Masoni, Joseph Lombardo, and Emprise Corp., also owned more than 80 percent of the stock of Daytona Beach.

Masoni, a civil engineer, and his group of associates were since the early 1940's financially interested in at least six greyhound or thoroughbred racetracks. Two of these racetracks had operated for some period of time under the jurisdiction of a Federal bankruptcy court. Masoni's responsibilities with regard to the racetracks including Jefferson Downs, Inc., involved oversight of the basic policies of the operations and management of the financial transactions. He was not engaged in the day-to-day operations of the racetracks.

Shortly after acquisition of the Jefferson Downs, Inc., stock, Masoni and his associates commenced acquisition of Magnolia Park's debentures in the open market. The proposed plan of reorganization of Magnolia Park then in effect provided that holders of Magnolia Park's debentures were to receive 3½ shares of Magnolia Park's stock for every $10 worth of debentures submitted plus moneys. In Masoni's opinion the owners of the debentures would eventually become the controlling shareholders of Magnolia Park.

Jefferson Downs, Inc.'s operations of the Jefferson Downs Racetrack were subject to constant harassment by officials and residents of Jefferson Parish and hostility by Woldenberg and Goldring. On April 30, 1965, Daytona Beach purchased the Metarie real property from Woldenberg and Goldring for approximately $2 million in order to put an end to interference with Jefferson Downs, Inc.'s operations and to remove Woldenberg and Goldring's opposition to the operation of the racetrack on the property.[3] Daytona Beach, rather than Jefferson Downs, Inc., acquired the property because it had the necessary financial resources. The lease between the trustee and Woldenberg and Goldring was assigned to Daytona Beach.

As the result of this acquisition, title to the property upon which the Jefferson Downs Racetrack was located was held by Daytona Beach, a corporation controlled by Masoni and his associates. The operation of the racetrack was in the hands of

---

[3]The real estate surrounding the racetrack had been developed as residential property. The highest and best use of the racetrack property was by that time residential use.

Jefferson Downs, Inc., another corporation controlled by Masoni and his associates. Interposed between Daytona Beach and Jefferson Downs, Inc., was the trustee for Magnolia Park who leased the Metarie property from Daytona Beach and leased the land and operating rights to Jefferson Downs, Inc.

After acquiring the Metarie property, Daytona Beach commenced discussions with the trustee in order to remove him from his position between Daytona Beach and Jefferson Downs, Inc. These discussions were expedited when Hurricane Betsy struck the New Orleans area on September 8, 1965, substantially destroying the improvements on the Metarie property.

As a result of the damage to the Jefferson Downs Racetrack facilities, Jefferson Downs, Inc., was unable to conduct its racing meet scheduled for October 1965.

The trustee was required by the lease agreement with Daytona Beach to inform Daytona Beach within 60 days of the destruction of the improvements on the Metarie property by a casualty whether he intended to rebuild the facilities or abandon the lease. Jefferson Downs, Inc., was required by the operating agreement and lease with the trustee to inform the trustee within the same 60-day period if it intended to rebuild the facilities with the insurance proceeds and trustee certificates or forfeit the insurance proceeds to the trustee subject to reimbursement of outstanding trustee certificates. The total amount of windstorm insurance in force at the time of the hurricane was $620,000.

The trustee, Daytona Beach, and Jefferson Downs, Inc., reached a tentative agreement regarding reconstruction of the facilities sometime prior to October 4, 1965. The trustee intended to commence reconstruction forthwith even if Jefferson Downs, Inc., did not execute this agreement. In the event Jefferson Downs, Inc., decided not to execute the proposed agreement but did decide within the 60-day period to reconstruct the facilities, the trustee would allow it to do so and would assign to Jefferson Downs, Inc., the proceeds of the Small Business Administration loan for which the trustee intended to make application. The trustee felt that expeditious execution of this agreement was imperative in order to prepare the facilities in time for the March 1966 meet. The trustee applied for a $900,000 loan from the Small Business Administration on October 28, 1965. On

November 8, 1965, the tentative agreement was executed by the parties. Its relevant portion provides:

4. \* \* \* the TRUSTEE will issue Trustee Certificates either to the Small Business Administration at the direction of JEFFERSON DOWNS or to JEFFERSON DOWNS for the difference between the monies which are collected by either the Small Business Administration or JEFFERSON DOWNS from the insurance companies as a result of the windstorm damage due to the hurricane and the cost of rebuilding according to the building code or building regulations of Jefferson Parish. Said certificates, if issued to JEFFERSON DOWNS, are not to bear interest and are to be repaid from 80 percent of the income now available to creditors and not otherwise earmarked for repayment of the present outstanding Trustee Certificates. Said certificates, if issued to the Small Business Administration, are to bear interest at 3 percent which shall be paid by JEFFERSON DOWNS, and shall be redeemed as required by the Small Business Administration.

The $900,000 loan to the trustee and Jefferson Downs, Inc., was authorized by the Small Business Administration on November 24, 1965, on the condition that Daytona Beach guarantee the loan in full if Jefferson Downs, Inc., for any reason lost its franchise to race or ceased racing. Daytona Beach did not execute the guarantee and the loan was not consummated.

On November 8, 1965, Daytona Beach submitted alternative proposals to the trustee both of which involved the acquisition by Daytona Beach of the lease between the trustee for Magnolia Park and Daytona Beach.[4] The trustee submitted one of these proposals to the Securities and Exchange Commission for review. On December 17, 1965, Daytona Beach submitted to the trustee a proposal whereby the trustee would assign its lease to Daytona Beach and Daytona Beach would acquire 95 percent of Magnolia Park in a recapitalization. This proposal was also submitted to the Securities and Exchange Commission. Another proposal in which Daytona Beach would acquire the stock of Magnolia Park was submitted by Daytona Beach on January 7, 1966, and amended on January 20, 1966.

On February 7, 1966, the trustee submitted a "Trustee's Amended Plan of Reorganization of Magnolia Park, Inc." which was approved on March 8, 1966, by the District Court. This amended plan was prepared by the trustee and the Securities

---

[4]These alternative proposals also were intended by Daytona Beach to terminate the lease arrangement between the trustee and Jefferson Downs, Inc.

and Exchange Commission from the proposal submitted by Daytona Beach on January 7, 1966.

It provided in pertinent part for the payment of 100 percent of the preferred claims, for the payment of 42 percent of the face value of the debentures and unsecured claims, and for the payment of $0.30 for each 100 shares of the old common stock in lieu of 1 share of new common stock for each 100 shares of old common stock in the original plan. The trustee was to make these payments from deposits by Daytona Beach of $300,000 cash and an irrevocable letter of credit in the amount of $750,000. To the extent these deposits were not depleted they were to be returned to Daytona Beach in reduction of the purchase price of common stock. In addition, the trustee agreed to an assignment of the insurance proceeds resulting from the destruction caused by Hurricane Betsy to Jefferson Downs, Inc., in lieu of payment on the trustee certificates totaling $237,944 held by it.[5] At the time the amended plan was submitted, the insurance company had made an offer in settlement of $220,000. Daytona Beach also agreed to cause the cancellation of indebtedness of $162,936.29. The charter of Magnolia Park was to be amended canceling all of the old common stock and issuing new common stock, all of which was to be issued to Daytona Beach. The existing shareholders of Magnolia Park would have no further ownership interest.

At the time the amended plan was submitted, the outstanding debentures of Magnolia Park had a face value of $1,622,900.

---

[5]The exhibits, testimony, and briefs are contradictory with regard to which entity received this assignment by the trustee. Respondent states that the proceeds were assigned to Daytona Beach. Petitioner states that they were assigned to Magnolia Park. Masoni testified that they were assigned to Jefferson Downs, Inc. The proposals submitted by Daytona Beach to the trustee indicate that the insurance proceeds were to be assigned to Jefferson Downs, Inc., in satisfaction of the outstanding trustee certificates held by it if the Small Business Administration loan were not consummated, or to Daytona Beach, as its interest may appear. The amended plan merely provides that the trustee will assign any rights he has in the insurance policies. Testimony presented to the District Court states that an insurance claim in the amount of $221,000 is to be assigned to Daytona Beach. The trustee's report submitted to the creditors, debenture holders, and stockholders of Magnolia Park explaining the provisions of the amended plan indicates that the insurance proceeds will go to Daytona Beach as an asset of the corporation. However, Daytona Beach's financial statements for fiscal years ending Apr. 30, 1967, 1968, and 1969 do not indicate Daytona Beach's receipt of these funds. Magnolia Park on its tax return for its fiscal year ending June 30, 1966, offset the casualty loss occasioned by Hurricane Betsy with $176,817.60 insurance recoveries. In the "Order in Aid of Consummation of Amended Plan" the trustee was ordered to withdraw from the lawsuit "Jefferson Downs, Inc. vs. Windsor Realty Company" and the lawsuit was declared the sole property of Magnolia Park.

Possibly Magnolia Park retained the insurance proceeds as an asset of the corporation, but Daytona Beach, in its capacity as controlling shareholder, was considered by the parties to be the actual owner. Daytona Beach could have then caused an assignment of the proceeds to Jefferson Downs, Inc.

Over 50 percent of the outstanding debentures with an approximate face value of $811,450 were held by Masoni and his associates in their individual capacities.

The amended plan was approved by the District Court by order entered March 8, 1966.

In accord with the terms of the amended plan, all of the outstanding stock of Magnolia Park was canceled and a new certificate of stock of Magnolia Park, Inc., in the amount of 315,000 shares was issued to Daytona Beach on June 15, 1966. Prior to this the common stock of Magnolia Park had been owned by individuals and entities who held no interest in Daytona Beach or Jefferson Downs, Inc.

Masoni explained that Daytona Beach's sole purpose in making the various proposals to the trustee was removal of the trustee from his position between Daytona Beach and Jefferson Downs, Inc. Daytona Beach substituted the stock acquisition proposal for the original proposals in order to acquire Magnolia Park's lease interest and its other assets consisting of the insurance proceeds, the cash residual remaining after the chapter X reorganization of approximately $15,000 to $20,000, and the racetrack facilities with a salvage value of approximately $100,000 subject to the operating agreement with Jefferson Downs, Inc.

Of the $300,000 cash deposit and the $750,000 letter of credit, the trustee remitted to Daytona Beach $131,656.76 of the cash deposit on May 16, 1967, and the letter of credit was reduced by $97,986.18 representing the unexpended balance as of Daytona Beach's fiscal year ending April 30, 1969. In its fiscal year ending April 30, 1968, Daytona Beach made payment on releases of $162,936.29 as obligated by the amended plan. Daytona Beach actually expended approximately $983,293.11 in acquiring the stock of Magnolia Park.

On its corporate income tax return filed for its fiscal year ending June 30, 1966, Magnolia Park reported a net operating loss of $1,194,297.65, $1,025,723.75 of which was composed of the casualty loss arising from the damage caused to the Jefferson Downs Racetrack facilities by Hurricane Betsy. The casualty loss was computed as follows:

| | |
|---|---|
| Cost of destroyed assets | $2,417,238.30 |
| Less: | |
| Accumulated depreciation | (1,114,696.95) |
| Book value | 1,302,541.35 |
| Less: | |
| Estimated salvage value | (100,000.00) |
| Casualty loss | 1,202,541.35 |
| Less: | |
| Recovery from insurance | (176,817.60) |
| Net casualty loss | 1,025,723.75 |

Testimony presented at the hearing held before the District Court for approval of the amended plan established that the highest and best use of the Metarie property was for multifamily residential units and, if put to this use, it would have a value of $3,624,000 as of the date of the hearing. The general manager of the Jefferson Downs Racetrack testified that if the racetrack were rebuilt on the Metarie property the extremely strict building codes and standards which would have to be complied with would cause an extended period of time for reconstruction.

Jefferson Downs, Inc., and Daytona Beach intended and preferred to rebuild the track facilities at the Metarie property because it was already owned by Daytona Beach and it offered the quickest avenue for Jefferson Downs, Inc.'s resumption of racing operations. Jefferson Downs, Inc., made an application to the Louisiana Racing Commission for a license to conduct its meet for the fall 1966 and spring 1967 dates and the license was granted. Early in 1966 Richard Mouledous, an architect, prepared, at Jefferson Downs, Inc.'s request, preliminary designs for the Jefferson Downs Racetrack on the Metarie property. These plans were submitted informally to officials of Jefferson Parish. However, objections to existence and rebuilding of the racetrack were voiced by officials of Jefferson Parish and the residents of the community. Efforts to appease the opposition by redesigning the plans proved unsuccessful. Jefferson Downs, Inc., did not submit the required complete working drawings and specifications because it became apparent to it, after submitting the preliminary designs and discussing them with officials of Jefferson Parish, that it would have taken several years for Jefferson Downs, Inc., to obtain the necessary approval for rebuilding the racetrack on the Metarie property.

Consequently, in mid–1966, Jefferson Downs, Inc., and Daytona Beach commenced efforts to secure an alternative tract of land on which to rebuild the racetrack. In late 1966, a suitable tract of land known as the Kenner site was located and the acquisition process started. After obtaining a favorable zoning change in early 1967, acquisition of the Kenner property by Daytona Beach was completed and construction of the new racetrack commenced. It originally was contemplated that the racetrack on the Kenner property would be completed by the early fall, 1968, and the facilities were substantially completed by that time. But, because of a problem with the access roads which the State of Louisiana was to construct, the refusal of the racing commission to grant a license until ordered to do so by a court, and for other reasons beyond the control of Daytona Beach and Jefferson Downs, Inc., the new racetrack did not open for business until August 1971. The Kenner site was about 4 miles from the Metarie property and the relocation did not result in any change in the customers who patronized the Jefferson Downs Racetrack.

On September 1, 1967, Daytona Beach and Magnolia Park amended the net ground lease substituting the Kenner property for the Metarie property. As a consequence Daytona Beach became the owner of the Metarie property free of the lease. Also on September 1, 1967, Jefferson Downs, Inc., and Magnolia Park amended the operating agreement and lease substituting the facilities to be constructed on the Kenner property for those previously located on the Metarie property.

On October 31, 1967, a fire at the Jefferson Downs Racetrack on the Metarie property resulted in an additional $75,000 casualty loss thereby reducing the salvage value of the racing facility to $25,000.

On February 14, 1968, a final decree and order closing the estate was entered by the District Court in the Magnolia Park bankruptcy proceeding discharging Magnolia Park, Inc., from all its debts and liabilities and, after approving his final account, discharging the trustee.

On April 14, 1969, prior to completion of the new racetrack on the Kenner property, Daytona Beach and Magnolia Park entered into an agreement of merger which resulted in Magnolia Park being merged into Daytona Beach on April 30, 1969. One of the factors considered in deciding to merge the two companies

was the tax advantages that might accrue to Daytona Beach as a result of the merger.

In 1973 and 1974 Jefferson Parish acquired, on the threat of condemnation, the Metarie property from Daytona Beach for approximately $6,800,000 for public park purposes.

Jefferson Downs held race meets at the Kenner property in 1971, 1972, 1973, 1974, and 1975 and paid to Daytona Beach the rents due it under this amended operating agreement and lease.

The total of the net operating losses of Magnolia Park for its fiscal years ending June 30, 1965, June 30, 1966, June 30, 1967, June 30, 1968, and April 30, 1969 was $1,598,251.60 computed as follows:

| | |
|---|---|
| 6/30/65 | $154,134.46 |
| 6/30/66 | 1,194,297.65 |
| 6/30/67 | 150,798.53 |
| 6/30/68 | 95,409.26 |
| 4/30/69 | 3,611.70 |
| | 1,598,251.60 |

On Daytona Beach's corporate income tax returns for its fiscal years ending April 30, 1970, April 30, 1971, and April 30, 1972, $715,337.72, $850,238.23, and $32,675.65, respectively, were claimed as net operating loss carryover deductions resulting from the merger with Magnolia Park. In his notice of deficiency, respondent disallowed these deductions on the grounds mentioned at the beginning of this opinion.

## OPINION

The issues for decision are whether petitioner Daytona Beach is precluded from utilizing the net operating losses of Magnolia Park incurred prior to its reorganization in 1966 under chapter X of the Bankruptcy Act by either (1) section 269(a) of the Code, or (2) by the rationale of *Willingham v. United States*, 289 F.2d 283 (5th Cir. 1961). For reasons heretofore stated respondent has the burden of proof on both of these issues.

Application of section 269(a)[6] is dependent upon respondent's

---

[6]Sec. 269(a) provides in pertinent part:

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *

proving by competent evidence that the principal purpose motivating petitioner's acquisition of all of Magnolia Park's stock was avoidance of income taxes by securing the benefit of Magnolia Park's net operating losses for tax purposes. To sustain his burden of proof respondent must establish by a preponderance of the evidence that a purpose for the acquisition of control of Magnolia Park at the time of acquisition was tax avoidance and that this purpose exceeds all other purposes in importance. *Commodores Point Terminal Corp. v. Commissioner*, 11 T.C. 411, 416 (1948); *Bobsee Corp. v. United States*, 411 F.2d 231, 238 (5th Cir. 1969); sec. 1.269–3(a), Income Tax Regs.

Respondent has failed to do this. Our examination and analysis of the facts and the arguments presented by respondent lead us to the conclusion that he has attempted to build bricks without sufficient straw. The evidentiary gaps and lapses in this case, harmful as they would be to petitioner were the burden of proof on it with regard to section 269(a), are as fatal to respondent.

The transaction by which Daytona Beach acquired control of Magnolia Park and the merger which enabled Daytona Beach to utilize the net operating losses against its income were separated by 2 years. Respondent, adopting an aggregate approach, submits that the circumstances surrounding both transactions be scrutinized in determining the principal purpose for the acquisition of control of Magnolia Park in 1966. We have held that a fragmented approach to various transactions is inappropriate for purposes of section 269(a) when the evidence reveals a course of conduct which was essentially unitary both in conception and impact. *Swiss Colony, Inc. v. Commissioner*, 52 T.C. 25, 38–39 (1969), affd. 428 F.2d 49 (7th Cir. 1970). However, we are not convinced by the record, in light of respondent's burden, that the two transactions involved were part of a single plan conceived by Daytona Beach prior to the stock purchase in 1966. As will be

---

\*     \*     \*     \*     \*     \*     \*

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) * * * control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

amplified, respondent relies on assumptions and inferences unsupported by the record in his effort to intertwine the transactions. Consequently, we look primarily to the circumstances surrounding the 1966 stock acquisition in deciding whether respondent has sustained his burden of proof. In the absence of a preconceived plan, the statement of the Ninth Circuit in *Hawaiian Trust Co. v. United States*, 291 F.2d 761, 768 (9th Cir. 1961), is illuminating:

> In effect, the Government is saying that even though, at the time of acquisition, Refiners had a business and not a tax evasion purpose, when it *subsequently* ascertained the tax consequences it revived or kept Hilo Gas alive in order to take advantage of a possible loss carryover. The determining factor, however, is the intention or purpose of Refiners *at the time of acquisition.* Refiners having acquired control of Hilo Gas for business reasons alone and without considering the tax aspects of the transaction, the intention or purpose "for which (such) acquisition was made" would not be changed from a business into a tax evasion purpose when it subsequently ascertained the tax consequences of the transaction.[7]

Respondent's arguments to support application of section 269(a) essentially are twofold. First, he argues that there was no valid business reason for Daytona Beach's acquisition of either the stock or the lease interest of Magnolia Park. Therefore, tax motivations must have predominated in Daytona Beach's decision to acquire Magnolia Park. Second, respondent maintains that the objective facts surrounding the method of acquiring control of Magnolia Park prove that Daytona Beach's predominant purpose was tax avoidance.

Masoni, president of Daytona Beach, whose testimony is of particular importance in a case such as this (*D'Arcy-MacManus & Masius, Inc. v. Commissioner*, 63 T.C. 440 (1975)), testified that Daytona Beach's only purpose in acquiring the stock of Magnolia Park was to remove the trustee from the middle position between Daytona Beach, the owner of the Metarie property, and Jefferson Downs, Inc., the operator of the racetrack and sublessee of the Metarie property. Because

---

[7]Moreover, we have recently stated in *Power-Line Sales, Inc. v. Commissioner*, T.C. Memo. 1977-43:

"Respondent submits that, where the acquisition and the next step necessary to gain the benefit of the tax loss (the merger) involve two separate steps, we may properly find that the two steps were part of a preconceived plan considering evidence of a tax avoidance motive at the time of the merger to infer petitioner's state of mind at date of acquisition. Since the second step, use of the loss, begets the very question at issue, we do not see how its presence adds anything. To cite it as a probative fact smacks of bootstrapping."

Daytona Beach and Jefferson Downs, Inc., were owned by the same group of investors, this goal was by no means specious. A trustee in bankruptcy, whose every move must be approved by the bankruptcy court, could well be a thorn in the side of a racetrack business operation. In fact, respondent concedes that removal of the trustee was of primary concern to Daytona Beach.

Respondent argues, however, that after Hurricane Betsy, Daytona Beach could have eliminated the trustee by deliberately causing the trustee to forfeit his lease interest in the Metarie property and its failure to do so is evidence that the stock acquisition was a device used only to acquire eventual use of Magnolia Park's net operating losses. In effect respondent is contending that Daytona Beach's failure to act in bad faith with regard to the trustee proves his case.

The argument is untenable. First, there is no evidence that the trustee could not have raised the money to rebuild the racing facility. The trustee clearly intended to make an effort to do so. The only evidence is that the trustee negotiated a SBA loan of $900,000 but it was not consummated because Daytona Beach would not guarantee the loan under the original terms requested by the SBA. Furthermore, in order to operate a racetrack in Jefferson Parish, Jefferson Downs, Inc., and/or Daytona Beach had to maintain good relations with the racing commission and other State and local authorities and with the citizens of the area, and such a relationship would probably have been endangered by an apparent plan to squeeze out the creditors and stockholders of Magnolia Park. In addition, the District Court was still interested in protecting the interests of Magnolia Park's creditors. The fact that Daytona Beach sought to eventually eliminate the trustee by acquiring the stock of Magnolia Park rather than by forcing a forfeiture of the lease does not prove either a lack of business purpose in acquiring the stock or a dominant tax avoidance purpose.

In arguing that the objective facts surrounding the acquisition of Magnolia Park's stock prove a predominant purpose of tax evasion, respondent relies heavily upon the deciding factors utilized in *Canaveral International Corp. v. Commissioner*, 61 T.C. 520 (1974).

In *Canaveral International Corp.*, the taxpayer, Canaveral, was approached by the attorney of the sole shareholder of a

corporation which had as its only asset a large yacht. The attorney attempted to negotiate a sale of the yacht by the corporation to the taxpayer. In the initial negotiations, the chairman of the board of directors of the taxpayer proposed to purchase the yacht with Canaveral's stock. However, Canaveral discovered that the yacht, which the Tax Court determined had a fair market value of $177,500, was being carried on the books of the corporation at a cost of $769,632.75. Upon discovery of this fact, Canaveral changed the terms of the transaction to a purchase of the stock of the corporation owning the yacht rather than the yacht itself. A year later the yacht was sold for $250,000. In reporting this sale on Canaveral's consolidated Federal corporate income tax return, the corporation which owned the yacht claimed a section 1231 loss of $511,726 based on the difference between the selling price and the adjusted basis of the yacht. In disallowing the deduction, respondent determined that Canaveral had acquired the stock of the corporation owning the yacht for the principal purpose of tax avoidance. This Court, in upholding respondent's disallowance, noted that the taxpayer, after its representatives, including a New York attorney-accountant versed in tax matters, had examined the books, proposed acquiring the corporation instead of the yacht, and that the potential tax benefits from the stock acquisition were so disproportionate in relation to the consideration paid for the stock as to cause a major distortion in the taxpayer's income.

Applying the factors utilized by *Canaveral International Corp.*, to the facts of this case, respondent points out that Daytona Beach originally had proposed to the trustee acquisition of Magnolia Park's lease interest. Only 6 weeks later, on December 17, 1965, Daytona Beach proposed acquisition of the corporation itself.

Masoni explained without contradiction that the change was occasioned so that Daytona Beach could acquire the other assets belonging to Magnolia Park as well as its lease interest. Those remaining assets were the insurance proceeds, the cash residual remaining after the chapter X reorganization of approximately $15,000 to $20,000, and the racetrack facilities with a salvage value of $100,000 subject to the operating agreement with Jefferson Downs, Inc. Masoni's testimony on this point is not inherently unbelievable. Although the insurance proceeds of $220,000 representing the settlement offer eventually were

assigned to Jefferson Downs, Inc., in satisfaction of the trustee certificates held by it, the racetrack facilities were insured for $620,000 and litigation had been instituted against the insurance company for a larger recovery. Furthermore, Daytona Beach intended to rebuild the facilities on the Metarie property and resume racing. This intent taken in conjunction with its desire to remove the trustee from the picture renders credible its interest in acquiring the corporation itself.

However, respondent attempts to finesse petitioner's stated purpose for the substitution of proposals by arguing that the record is not clear with regard to why the change was made and that the record as a whole infers that tax implications were the deciding factor. Masoni's extensive background in business and financial affairs, plus petitioner's representation by counsel during the negotiations, is cited as proof that Daytona Beach was cognizant of the tax benefits to be derived from the stock acquisition as opposed to acquisition of the lease interest. While this surmise may not be unreasonable, it is still nothing more than that. There is no evidence in the record that Masoni was actually aware of the possible tax benefits to Daytona Beach in 1966. Even though Masoni undoubtedly was aware that Magnolia Park had operating losses because of the destruction caused by Hurricane Betsy and because of its insolvency, it is too long a jump to assume that tax ramifications dictated the change in proposals. Masoni was an engineer, not an attorney or an accountant. That Daytona Beach was represented by counsel in its negotiations with the trustee does not of itself indicate that tax advice was given. Furthermore, had the racetrack been reopened within the time estimated, there is no reason to believe that Magnolia Park itself could not have absorbed the loss with its own income. And although Daytona Beach received tax advice with regard to the 1969 merger, nothing in the record suggests that Daytona Beach's attorney gave advice or was questioned about tax aspects of various types of corporate acquisitions in 1966. Based on the record and respondent's inability to establish with something more substantial than inference and assumptions that the income tax laws motivated the substitution of proposals, we accept petitioner's explanation.

Respondent, still relying on *Canaveral International Corp.*, argues that Daytona Beach's purchase price for the stock relative to the amount of Magnolia Park's net operating losses

accruing to Daytona Beach as a result of the merger caused a material distortion in petitioner's income.

Respondent's mathematics are based on a misunderstanding of the financial realities of the stock purchase. We have found as a fact that Daytona Beach actually paid $983,293.11 for the stock of Magnolia Park. On Magnolia Park's income tax return for its fiscal year ending June 30, 1966, a net operating loss of $1,194,297.65 was reported, $1,025,723.75 of which was composed of the casualty loss resulting from Hurricane Betsy. The fact that some of the moneys provided by Daytona Beach were to be paid to Masoni and his associates as debenture holders does not mean that Daytona Beach paid less for the stock. The individuals were simply being reimbursed for their investment in the debentures.

We must agree with petitioner's assertion that an approximate $983,293.11 cost for a net operating loss of at most $1,194,297.65, subject to reduction by the receipt of additional insurance proceeds in excess of the settlement offer, does not cause such a distortion of Daytona Beach's income as to prove that a preconceived plan of stock purchase and merger existed or that the principal purpose for structuring the transaction as it was structured was tax avoidance.

We conclude that respondent has failed to carry his burden of proving that the principal purpose for Daytona Beach's acquisition of the stock of Magnolia Park was tax evasion or avoidance. Consequently, we hold that section 269(a) does not apply to uphold the disallowance of petitioner's carryforwards of Magnolia Park's net operating losses incurred prior to the chapter X reorganization.

As an alternative argument to section 269(a), respondent, relying on the rationale and the result of *Willingham v. United States*, 289 F.2d 283 (5th Cir. 1961), cert. denied 368 U.S. 828 (1961), urges that disallowance of the carryforwards by Daytona Beach of the net operating losses incurred by Magnolia Park prior to its reorganization under chapter X be affirmed. For the reasons set forth below, we do not accept this proposition.[8]

*Willingham*, decided under the Internal Revenue Code of 1939 and relying upon *Libson Shops, Inc. v. Koehler*, 353 U.S. 382

---

[8] Respondent recently attempted this argument in a different factual context. We declined to follow it in *Jacqueline, Inc. v. Commissioner*, T.C.Memo. 1977-340.

(1957), broached in the context of admissibility of evidence the question of—

> whether a corporation whose debts have all been wiped out by a Bankruptcy Act reorganization is nevertheless "the same taxpayer" which the terms of the carry-over provision of the Internal Revenue Code [of 1939] say can carry forward the losses which created the forgiven debts in order to wipe out income for tax purposes in future years. [289 F.2d at 286.]

The Fifth Circuit held—

> In the case before us we have * * * substantially the same kind of business carried on, but by a corporation having entirely new stock ownership and with an entirely new corporate structure. Its debts have been wiped out, by the adoption of the plan provided for under the Bankruptcy Act * * *
>
> We think that in every sense of the word except for the uninterrupted corporate existence under the state charter, the taxpayer that commenced operations on November 20, 1950, was * * * a new business enterprise. * * * It, therefore, does not fit into the scheme which Congress had in mind when it passed the carryover law, "designed", as the Supreme Court said in Libson, to "permit a taxpayer to set off its lean years against its lush years, * * * ." This loss taxpayer "set off its lean years" by having them wiped out in reorganization proceedings. [289 F.2d at 286-287.]

Since *Willingham* was decided, sections 381 and 382 were enacted as part of the Internal Revenue Code of 1954. Section 381 provides for the carryover of specified tax attributes, including net operating losses, in specified corporate acquisitions including statutory mergers. Section 382 provides for specific limitations on the use of net operating losses in corporate acquisitions under certain circumstances. This Court and the Fifth Circuit have held that *Libson Shops* has no application to cases decided under the 1954 Code where the provisions of sections 381 and 382 apply. Rather, sections 381 and 382 control the fact and the amount of the carryover of net operating losses.[9] *Clarksdale Rubber Co. v. Commissioner*, 45 T.C. 234, 244 (1965); *Coast Quality Construction Corp. v. United States*, 463 F.2d 503, 510–511 (5th Cir. 1972).

Because *Libson Shops* no longer applies to corporate acquisitions covered by sections 381 and 382, the major underpinning of

---

[9]In this case respondent has stipulated the merger of Magnolia Park and Daytona Beach was an acquisition of assets described in sec. 381(a) and that any operating loss carryover of Magnolia Park to which Daytona Beach may thereby become entitled shall not be reduced by the provisions of sec. 382(b). We do not understand respondent to argue on brief that sec. 382(a) applies to disallow the net operating loss carryovers.

*Willingham's* rationale is no longer viable. Consequently, this portion of *Willingham* has no precedential value to our case.

Despite this development, respondent contends as a matter of law that the losses incurred by Magnolia Park prior to the chapter X reorganization may not be carried forward because of their partial satisfaction in bankruptcy and Magnolia Park's discharge. This "clean slate" doctrine, premised on *Willingham,* had no statutory support in the tax statutes applicable to the transactions here involved. Sections 381 and 382 specifically allow these carryforwards unless otherwise limited by those sections.[10] Because of these statutory provisions, we do not feel compelled by *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), to apply *Willingham.* Congress in enacting the Internal Revenue Code and the Bankruptcy Act was attempting to deal with different areas and problems. If a taxpayer derives benefits otherwise allowable by both laws, it is not for us to strike down, but Congress.

For the reasons stated above we cannot sustain respondents disallowance of the net operating losses claimed by petitioner. To permit the parties to ascertain the amount of the remaining deficiency,

*Decision will be entered under Rule 155.*

---

[10]Respondent's reliance on the earnings deficit cases which involved railroad bankruptcies, *Dunning v. United States,* 353 F.2d 940 (8th Cir. 1965); *United States v. Kavanagh,* 308 F.2d 824 (8th Cir. 1962); *McCullough v. United States,* 344 F.2d 383 (Ct. Cl. 1965); *Banister v. United States,* 236 F. Supp. 972 (E.D. Mo. 1964), is misplaced. None of these cases was decided under the 1954 Code and made no mention of it. Sec. 381(c)(2), enacted in 1954, contains specific limitations on the use of deficits in the transferor's earnings and profits. Because of this statutory change we believe these cases, while their language is generally supportive of respondent's theory, are of dubious value under the 1954 Code. Moreover, we reiterate that secs. 381 and 382 require special treatment of net operating losses.